**In re BABCOCK & WILCOX COMPANY.**

**Diamond Power International, Inc., Babcock & Wilcox Construction Co., Inc., Americon, Inc., Debtors.**

**The Official Asbestos Claimants' Committee' and Eric D. Green, Legal Representative for Future Asbestos Claimants, Plaintiff–Interveners,**

**v.**

**The Babcock & Wilcox Company; Babcock & Wilcox Investment Co.; McDermott, Inc.; McDermott Technology, Inc.; BWX Technologies, Inc.; Hudson Products Corp.; and Tracy Power, Inc., Defendants.**

**Bankruptcy Nos. 00–10992 to 00–10995. Adversary No. 01–1155.**

United States Bankruptcy Court, E.D. Louisiana.

Feb. 8, 2002.

James L. Patton, Jr., Young, Conaway, Stargatt & Taylor, Wilmington, DE, J. David Forsyth, Sessions, Fishman & Nathan, New Orleans, LA, for Eric Green, Futures Representative.

David M. Bernick, Theodore L. Freedman, Kirkland & Ellis, Chicago, IL, Jan M. Hayden, William H. Patrick, III, Heller, Draper, Hayden, Patrick, & Horn, L.L.C., New Orleans, LA, for debtors.

John M. Duck, Adams & Reese, New Orleans, LA, Daniel R. Murray, Barry Sullivan, Jenner & Block, Chicago, IL, for Babcock & Wilcox Investment Co., McDermott, Inc., McDermott Technology, Inc., BWX Technologies, Inc., Hudson Products Corp., and Tracy Power, Inc.

William E. Steffes, Steffes & Macmurdo, Baton Rouge, LA, for Unsecured Creditors Committee.

Elihu Inselbuch, Caplin & Drysdale, New York City, Dennis LaBorde, Monica Suprenant, Baldwin & Haspel, New Orleans, LA, for Asbestos Claimants' Committee.

## MEMORANDUM OPINION

JERRY A. BROWN, Bankruptcy Judge.

### Table of Contents

I.  Introduction ................................................................ 233

II. Findings of Fact ............................................................ 233

    A.  Procedural posture ................................................... 233
    B.  The parties .......................................................... 233
    C.  The 1998 corporate restructuring ..................................... 234
    D.  B & W's asbestos liabilities and settlement strategy ................. 234
    E.  Values stipulated by the parties ..................................... 237
    F.  The plaintiffs' evidence on valuation of B & W's future asbestos liability ..... 238
        (1) Dr. Peterson's testimony ........................................ 238
        (2) Dr. Florence's testimony ........................................ 241
    G.  The defendants' forecasts of B & W's future asbestos liability ....... 243
        (1) B & W began estimating its potential total asbestos liability in 1993 / Daniel Gaubert's testimony ........................................ 243
        (2) B & W's 1993 forecast / Louis Burkart's testimony .............. 244
        (3) B & W's March 1997 forecast .................................... 246
        (4) Dr. Dunbar's testimony as to the March 1997 forecast .......... 247
    H.  Plaintiffs' criticisms of B & W's March 1997 forecast ............... 248
    I.  Dr. Dunbar's criticisms of the Dr. Peterson and Dr. Florence estimates..... 250
    J.  B & W's financial statements ......................................... 251
    K.  Amounts available to B & W to pay future asbestos ................... 253
    L.  The solvency of B & W ................................................ 254

III.  Conclusions of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .255

    A.   The Revocatory Action—in general . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .255
    B.   B & W's legal liability for asbestos personal injury claims . . . . . . . . . . . . . . . . . .255
    C.   Including future claims in a solvency analysis under the revocatory action . . . . .257
    D.   Plaintiffs' burden of proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .259
    E.   GAAP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .260
    F.   Plaintiffs did not meet their burden of proving B & W's insolvency as of
        July 1, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .261

## I.  INTRODUCTION

This adversary proceeding was tried for six days in October and November, 2001, and concluded on November 2, 2001. By Minute Entry entered on July 6, 2001, the court had determined that the trial would be bifurcated, and that in the first trial, the court would only determine the issue of whether the debtors were insolvent under Louisiana law as of July 1, 1998 or March 4, 1999.[1] The parties later stipulated that the relevant date was July 1, 1998.

Based on the testimony, exhibits, and the law, the court finds that the plaintiffs have failed in their burden of proving that the debtor, Babcock & Wilcox Company ("B & W"), was insolvent on July 1, 1998 under the Louisiana revocatory action.[2]

## II.  FINDINGS OF FACT

### A.  Procedural posture

1.  B & W, along with three affiliated companies, Diamond Power International, Inc., Babcock & Wilcox Construction Co., Inc., and Americon, Inc., filed for relief under Chapter 11 of the Bankruptcy Code on February 22, 2000. The cases are jointly administered.

2.  The court has jurisdiction over this adversary proceeding because it is a core proceeding under 28 U.S.C. § 157(b)(2)(H), as described in the Order and Reasons of June 26, 2001 by the District Court.[3]

### B.  The parties

3.  This adversary proceeding was initiated on April 30, 2001, as a complaint for declaratory judgment filed by the debtor, B & W, against its parent and certain affiliated companies.

4.  The Asbestos Claimants' Committee ("ACC"), appointed to represent current asbestos personal injury claimants, and Eric D. Green, the Future Claimants' Representative ("FCR"), appointed to represent asbestos personal injury claimants who make future claims, moved to intervene as party-plaintiffs, and filed motions to realign the parties. By Minute Entry Order of July 6, 2001, the court granted the motions to intervene, and realigned B & W as a defendant.[4]

5.  The plaintiffs, as realigned, are the ACC and the FCR.

6.  The Official Committee of Unsecured Creditors filed a motion to intervene, which was granted by order of June 4, 2001. Although the motion to intervene

---

1.  Pl. 128; Pl. 244—Joint Pretrial Order ("PTO") at 2.

2.  Other issues and causes of action raised by the pleadings in the adversary proceeding, such as whether the plaintiffs may challenge the transfers as illegal dividends under Delaware law, or whether the plaintiffs may attack the transfers under 11 U.S.C. § 548(a) were

not heard at the trial. This opinion addresses only the bifurcated issue as set forth in the Minute Entry of July 6, 2001.

3.  Pl. 112.

4.  Pl. 127.

did not state on which side the Unsecured Creditors Committee wanted to intervene, the Committee filed a post-trial memorandum in support of the defendants.[5]

7. The defendants are:

(a) the debtor, B & W;

(b) Babcock & Wilcox Investment Company ("BWICO");

(c) McDermott Incorporated ("McDermott Inc.");

(d) McDermott Technology, Inc. ("McDermott Technology");

(e) BWX Technologies, Inc. ("BWX Technologies");

(f) Hudson Products Corporation ("Hudson Products"); and

(g) Tracy Power, Inc.

8. BWICO is B & W's immediate parent and the entity to which the assets and liabilities of certain B & W subsidiaries were transferred as part of a broad corporate restructuring of the family of companies operated under McDermott International Inc. ("McDermott International").[6]

9. The plaintiffs claim that the transactions by which McDermott Technology, BWX Technologies, Hudson Products, and Tracy Power were transferred from B & W to BWICO should be revoked or annulled.

## C. The 1998 corporate restructuring

10. Beginning in 1996, McDermott International developed an overall restructuring program.

11. In accordance with a decision in March 1997 by the McDermott International board of directors, effective July 1, 1998, B & W distributed all the shares of three of its operating subsidiaries to its sole shareholder, BWICO, a second-tier subsidiary of McDermott International. Also effective on July 1, 1998, B & W transferred to BWICO a $313 million note receivable from BWICO together with a dormant shell corporation, which held as its only asset a $102.6 million (after tax) note receivable from BWICO, effectively extinguishing both obligations.

12. These distributions (the "transfers") reduced B & W's book value as shown on its financial statements by approximately $622 million or nearly 80%, from $791.2 million to $169.2 million. The plaintiffs assert that the transfers either were made when B & W was already insolvent or caused it to become insolvent in light of B & W's liability for asbestos personal injury claims.

## D. B & W's asbestos liabilities and settlement strategy

13. For many decades through the mid–1970's, B & W designed, constructed, and installed asbestos-insulated boilers at over 12,000 different sites including power plants, military and civilian ships, industrial facilities, shipyards, steel mills, and other locations.[7] Louis W. Burkart, Director of Environmental Safety, Health and Risk Management for McDermott, Inc. testified that B & W also had contract units that used asbestos-containing products in the course of performing repairs on B & W boilers around the world.[8]

---

5. See Pl. 42, 57, and 293.

6. In this opinion, the court has tried to refer to the correct party, but it may not always be possible to tell the identity of the correct party from the transcript. At times the witnesses may have referred to "McDermott", when they meant either "McDermott Inc.", "McDermott International", or possibly a team or group such as the McDermott Risk Management Department.

7. Ex. 1506 and Ex. 1507.

8. Transcript ("Tr.") 10/25/01 at 182–83. See Finding of Fact # 61, infra, for Mr. Burkart's qualifications.

14. Beginning in the early 1980s, B & W began to face thousands of personal injury complaints brought by individuals who suffered from asbestos-related diseases.[9]

15. P. David McKnight was the claims adjuster for B & W's primary insurer at the time, the Travelers Insurance Company ("Travelers"). Mr. McKnight was aware of the early asbestos litigation through his work at Travelers for other asbestos defendants such as Pittsburgh Corning and Johns–Manville, who had filed for bankruptcy in August 1982. After Johns–Manville filed for bankruptcy, there was a dramatic increase in the number of lawsuits being filed against other defendants that Travelers insured.[10] During this early period, he met with the Risk Management Department and internal law departments of B & W to discuss where the asbestos litigation was going and to decide what approach B & W should take in response. He testified that B & W could take one of three approaches:

(1) litigate every single case all the way to verdict and appeal;

(2) pick and choose, litigate some, and try to resolve others; or

(3) settle all cases, do not go to trial unless absolutely forced to.[11]

He concluded that the best approach to minimize the impact on B & W was to adopt the settlement strategy or "social engineering approach" in order to "keep transaction costs to a minimum" because asbestos personal injury cases against the right defendants would "inflame a jury," and there was the potential for harmful discovery.[12]

16. Mr. McKnight testified that Travelers, B & W, McDermott management, and himself, as part of the team, arrived at a consensus to adopt the settlement strategy.[13] Under the settlement strategy, B & W would negotiate a settlement protocol with the plaintiffs' lawyers not to name B & W as a defendant in a lawsuit, but, instead, to reach early settlements based on agreed schedules of payments, usually categorized by alleged disease.[14] He stated that "[w]e're not really interested in all kinds of technical questions about various legal liability issues", and that B & W had two basic criteria:

(1) "can the plaintiff demonstrate that he worked around the asbestos allegedly claimed in a B & W boiler?", and

(2) "can he present a medical diagnosis of an asbestos-related disease?" [15]

Mr. McKnight testified that these settlement criteria were based upon B & W's judgment as to the threshold proof a claimant would have to meet to "proceed to trial" (i.e., defeat a motion for summary judgment by B & W in the tort system).[16] The strategy was implemented through an administrative process for receiving, reviewing, and paying claims that was overseen by Mr. McKnight.[17]

17. Mr. McKnight testified that the type of evidence required to show exposure to a B & W boiler varied. B & W would accept an affidavit of exposure by the plaintiff, which would sometimes be augmented with a social security printout

---

9. Ex. 638 at 38550.

10. Tr. 10/22/01 at 63–66.

11. Tr. 10/22/01 at 66–67.

12. Tr. 10/22/01 at 68–69.

13. Tr. 10/22/01 at 69.

14. Tr. 10/22/01 at 70–73, 85.

15. Tr. 10/22/01 at 71–72.

16. Tr. 10/22/01 at 71–72.

17. Tr. 10/22/01 at 69–73.

of work history, union card records, a DD–214 form from the Navy, and depending upon the jurisdiction, an affidavit from the plaintiff's attorney.[18]

18. Mr. McKnight testified that the type of medical evidence required for the standard protocols was a "minimal threshold", which required that a claimant show he had worked at a facility that had a boiler manufactured by B & W, and a medical diagnosis that he had symptoms consistent with asbestosis or a pleural condition.[19]

19. Mr. McKnight's understanding was that B & W's liability was doubtful and in dispute, but that the plaintiffs' firms "held the cards", so B & W settled, usually for nominal or nuisance value.[20]

20. Mr. Burkart, Director of Risk Management for McDermott, Inc., testified that:

> The history of the claims showed that the plaintiff attorneys simply presented the claims to us with a minimum amount of information, and we would pay the claims. We were not a manufacturer, we were a secondary player, a small player. We believed that we were a conduit to pay claims efficiently and quickly to plaintiff attorneys.[21]

Mr. Burkart further testified that the goals of the B & W settlement program were: "To administer claims as efficiently as we could; to settle claims, in bulk, at a price that would be less than the administrative cost of handling them in court." [22]

21. When the Travelers' products liability limits of coverage were exhausted towards the end of 1989, B & W continued this strategy, with the settlements funded primarily by reimbursements from its excess insurance carriers. Mr. McKnight testified that after the policy liability limits were exhausted, the claims processing function was transferred to a new entity called Worldwide Services Company ("Worldwide"). Mr. McKnight joined Worldwide, and continued in his role as the primary negotiator and manager of the administrative settlement process for B & W.[23]

22. B & W, its corporate parents, and Worldwide often compared the settlement strategy's results for B & W to the results that other asbestos defendants were experiencing in the tort system.[24] Using the settlement strategy, B & W consistently settled cases for about 1% or 2% of the verdict amounts that were reported when the same claimant went to trial against other defendants.[25]

23. Mr. McKnight and the management of B & W and McDermott regularly reviewed B & W's settlement strategy and always concluded that the settlement strategy was far more cost effective than taking even selected cases to trial because B & W was not only settling cases for tiny fractions of jury awards to the same type of claimants, but saving substantially on defense costs, avoiding all discovery, avoiding the risk of punitive damages, and avoiding

---

18. Tr. 10/22/01 at 79.

19. Tr. 1022/01 at 149–51.

20. Tr. 10/22/01 at 146–148.

21. Tr. 10/25/01 at 17.

22. Tr. 10/25/01 at 12.

23. Tr. 10/22/01 at 74–75.

24. Ex. 612 at 016864–67, 016883–88; Ex. 526 at 6097B–6098; Ex. 527 at 6092A–6093A; and Tr. of 10/22/01 at 110–13, 118–19.

25. Ex. 612 at 016864; Tr. 10/22/01 at 113; Tr. 10/25/01 at 98, 104–07.

the risk of consolidated trials with other asbestos defendants.[26]

24. Although Mr. McKnight and Mr. Burkart testified that the evidence required to enter into a settlement under the standard protocols was minimal, B & W did not pay every asbestos claim presented to it.[27] Clearly, some level of evidence was required to settle under the protocols. B & W's asbestos-related costs would likely have been significantly higher if they had adopted a different strategy.

25. In an October 1996 letter to counsel for Lloyd's of London, Mr. Burkart wrote that unless increased insurance funding was received, B & W would be forced to abandon its settlement strategy and change "to an aggressive individual litigation ('Circle the Wagons') approach with all of the catastrophic consequences seen by several other companies."[28]

26. B & W continued to follow this settlement strategy until it became so expensive that another alternative had to be turned to—filing for Chapter 11 relief in February 2000.

27. Despite the advantage of its settlement strategy over litigation, B & W faced large and increasing costs to resolve its asbestos liabilities. Between 1990 and 1998, B & W paid 25,000 to 30,000 claimants each year, with the annual payments to resolve asbestos personal injury claims and the average cost of individual resolutions consistently increasing.[29] B & W and its insurers paid $196,091,000 to settle asbestos personal injury claims during the

fiscal year ending March 31, 1998. They then paid a total of $63,838,000 to settle asbestos personal injury claims for the next quarter ending June 30, 1998.[30]

28. As discussed further below, the plaintiffs' experts relied on the settlement history derived from B & W's settlements in making their forecasts. The defendants spent considerable time and effort at the trial seeking to attack B & W's settlement strategy and the supposedly low quality of the medical and exposure evidence required by B & W that generated the settlement history. This argument notwithstanding, B & W controlled what type of evidence it would require for settlement, and could have required higher standards of proof if it had wished. B & W chose to pay settlements so long as a plaintiff could present some evidence of exposure and disease that was sufficient in B & W's and Mr. McKnight's view for a plaintiff to be allowed to proceed to trial in the tort system.[31] No evidence was offered to show that stricter standards for medical or exposure evidence (or any other change to B & W's strategy) would have decreased B & W's overall liability. Indeed, Mr. McKnight and the management of B & W and McDermott regularly concluded that the settlement strategy led to lower claims costs.[32]

E. *Values stipulated by the parties*

29. The parties stipulated that on July 1, 1998, after the transfers, B & W's fairly appraised value, also called "enterprise value" or "going concern value," not in-

---

**26.** Tr. 10/22/01 at 118–19, 133–34; Tr. 10/25/01 at 93–96, 114–19; Ex. 612 at 016864–67, 016883–88; and Ex. 582 at 38033 34.

**27.** Tr. 10/22/01 at 77.

**28.** Ex. 754, p. 3; Tr. 10/25/01 at 99–101.

**29.** Ex. 638 at 38550; Ex. 112 at 6539; Ex. 114 at 6595; Ex. 115 at 6623; Ex. 117 at 6666.

**30.** PTO Stip. ¶¶ 16, 17.

**31.** *See* Finding of Fact # 16.

**32.** *See* Finding of Fact # 23.

cluding its asbestos liabilities and insurance available to pay asbestos claims, was $650 million.[33]

30. The parties stipulated that the undiscounted amount of insurance coverage available to B & W as of July 1, 1998 to pay for or reimburse asbestos personal injury claims was $1.485 billion.[34] For a number of reasons, B & W was not fully indemnified by its insurers for all of the asbestos claims paid in a given year. This resulted in a gap between the total payments of claims by B & W and the amount of the reimbursements from insurers.[35] The insurers reimbursed B & W for approximately 88% to 89% of the asbestos claim payments annually. The other 11% to 12% was borne by B & W.[36]

31. As a result of the stipulations, the determination of whether B & W was insolvent depends upon the amount of B & W's liability for asbestos personal injury claims net of available insurance on July 1, 1998.

F. *The plaintiffs' evidence on valuation of B & W's future asbestos liability*

32. Several expert witnesses testified as to the value of B & W's asbestos liability. The plaintiffs' experts were Dr. Mark A. Peterson for the ACC, and Dr. B. Thomas Florence for the FCR. The defendants' expert was Dr. Frederick Dunbar. All three were eminently qualified, familiar with mass tort litigation, and well recognized experts in their respective fields.

**(1)** *Dr. Peterson's testimony*

33. Dr. Peterson is an attorney with a Ph.D. from the University of California, Los Angeles, with a doctoral area of experimental social psychology.[37] He is associated with the Rand Institute, where for over 20 years he has been involved in studying the civil litigation system, including the mass tort claims process.[38] Dr. Peterson was recognized as an expert in asbestos claims estimation and forecasting.[39]

34. After confirming its accuracy, Dr. Peterson used B & W's claims history database as a basis for his estimates.[40] Dr. Peterson first estimated B & W's liability for claims pending on July 1, 1998. He grouped the pending claims into disease categories: mesothelioma, lung cancer, other cancer, asbestosis, and pleural disease. He discounted the total number of claims on July 1, 1998 by the historical percentage of claims that were rejected by B & W, and then multiplied the remaining "likely to be settled" claims by the average settlement amount for each particular claim category. Dr. Peterson arrived at a "preferred estimate" of $424 million as the liability for the 57,848 pending claims as of July 1, 1998. Dr. Peterson determined a "minimum estimate" of $377 million for the pending claims as of July 1, 1998.[41]

35. Dr. Peterson's methodology for estimating future claims assumed that, absent evidence to the contrary, future claims against B & W would broadly follow the historical patterns, with respect to: (1)

---

33. PTO Stip. ¶ 25.

34. PTO Stip. ¶ 10.

35. PTO Stip. ¶ 12.

36. Tr. 10/23/01 at 37–38; Tr. 10/25/01 at 118.

37. Tr. 10/22/01 at 169.

38. Tr. 10/22/01 at 170–72.

39. Tr. 10/22/01 at 189.

40. Tr. 10/22/01 at 192–94; Ex. 777 and 787.

41. Tr. 10/22/01 at 196–209; Ex. 2000–1 through 2000–8.

claims against B & W relative to the continuing incidence of asbestos-related cancers in the general population, (2) the ratio of non-malignant to malignant claims, and (3) amounts paid to settle claims for different diseases.[42] He testified that his methodology also took into account the foreseeable changes in factors affected by non-epidemiological influences—including (1) changes in the propensity to file against B & W, (2) the ratio of non-malignant to malignant disease claims, and (3) the amounts paid to settle cases.[43]

36. To predict the ongoing incidence of asbestos-related cancers, Dr. Peterson used the 1982 work of Drs. Nicholson and Selikoff,[44] and the refinement of that work done by KPMG in 1991 and 1992.[45] He testified that these studies analyzed the incidence of asbestos-related cancer deaths in a range of occupations, and projected the number of such deaths in the United States in future years.[46] The Nicholson/KPMG projections took into account differences in intensity of exposure in various occupations, and the resulting differential impact on incidence of disease.[47] Dr. Peterson testified that there is a very good correspondence between the various occupational exposures measured by Nicholson and those in which B & W had caused people to be exposed.[48]

37. The Nicholson/KPMG studies had predicted that during the 1990's, the incidence of asbestos-related cancers would gradually peak and begin to go down slowly until ending in the year 2040.[49] Dr. Peterson testified that the accuracy of these projections of incidence for mesothelioma has been confirmed by data on actual mortality experience collected by the National Cancer Institute.[50] He further stated that the close correspondence between predicted and actual incidence of mesothelioma validates the Nicholson/KPMG projections for the other asbestos-related cancers.[51]

38. Dr. Peterson then measured the relationship between the overall incidence of asbestos-related cancer deaths and claims against B & W—the "propensity to claim." He found that during the most recent period annual claims against B & W alleging mesothelioma (the "claiming ratio") represented about one-third of the number of deaths from mesothelioma nationwide.[52] In his analysis, he made alternative assumptions—that the claiming ratio would remain at its 1998 levels, or that it would increase for the next five years at the rate it had increased over the previous five.[53] He made a similar analysis, and similar alternate assumptions, for lung and other cancers.[54]

39. Dr. Peterson next estimated future claims for non-malignant diseases, i.e., asbestosis and pleural scarring, for which

**42.** Tr. 10/22/01 at 209–10.

**43.** Tr. 11/2/01 at 36–43; Ex. 2002–5.

**44.** Ex. 1503.

**45.** Ex. 1502.

**46.** Tr. 10/22/01 at 221–224; Ex. 2000–11; Ex. 2000–12.

**47.** Tr. 10/22/01 at 221–27.

**48.** Tr. 11/2/01 at 28–29.

**49.** Tr. 10/22/01 at 239; Ex. 2000–11; Ex. 2000–12.

**50.** Tr. 10/22/01 at 229–33; Ex. 1508; Ex. 2000–13.

**51.** Tr. 10/22/01 at 234–35.

**52.** Tr. 10/22/01 at 239–40; Ex. 2000–20.

**53.** Tr. 10/22/01 at 242–44; Ex. 2000–24.

**54.** Tr. 10/23/01 at 10–16; Ex. 2000–29; Ex. 2000–34.

there is no epidemiological work as there is for the cancers.[55] Dr. Peterson looked to the historical relationship of B & W's non-malignant claims to its cancer claims—the "non-malignant multiplier." [56] In doing so, he considered B & W's historical experience of the relationship between the two types of claims, observing that over the 1995–97 period, that ratio had increased by about 15%.[57] He made alternative assumptions in his estimates—that the ratio would remain at its 1998 level, or that it would increase over the first five years of his projection as it had in recent years.[58]

40. Dr. Peterson's methodology is one of those described in detail in Dr. Dunbar's book on estimating future claims.[59]

41. Dr. Peterson made two estimates of B & W's future asbestos claims as of July 1, 1998: a "preferred estimate", which incorporated the assumptions he judged to be the most likely, and a "minimum estimate", which used what he judged to be the most conservative plausible assumptions, and which he stated set the lowest reasonable bound for the estimated liabilities.[60]

42. To estimate the financial liability B & W faced to resolve future claims, Dr. Peterson considered the cost at which B & W had been able to resolve similar claims in the past, and the percentage of claims that had been rejected.[61] He again made alternative assumptions regarding future costs of settlement:

(1) the preferred estimate—the settlement amount would increase by 10% annually (B & W's recent experience) for five years and thereafter by 2.5%, to reflect general inflation, and,

(2) the minimum estimate—the settlement costs would increase only by 2.5% for general inflation.[62]

In both estimates, asbestos claims were projected to continue against B & W until at least 2040, and not to fall below 10% of 1998 levels until the 2030's.[63]

43. Dr. Peterson's preferred estimate of B & W's liabilities for future asbestos claims as of July 1, 1998 was 871,777 claims at a total undiscounted cost of $10.7 billion. His minimum estimate was 651,-945 claims at a total undiscounted cost of $5.9 billion.[64]

44. Dr. Peterson then added his estimates of settling the 57,848 claims pending on July 1, 1998 to the estimates of B & W's future liabilities.[65] To the sum of the amounts to resolve both pending and future claims, he added the costs of defense, assumed to be equivalent to B & W's historical experience of 4% of liability. The result estimated undiscounted cost totals were $11.6 billion for the preferred

55. Tr. 10/23/01 at 20; Tr. 10/23/01 at 93–94, 109.

56. Tr. 10/23/01 at 19–21.

57. Tr. 10/23/01 at 22–24; Ex. 2000–39.

58. Tr. 10/23/01 at 28; Ex. 2000–38; Ex. 2000–40.

59. See Ex. 1603 at 63, 73–77, 120–21: Frederick C. Dunbar, et al., Estimating Future Claims: Case Studies from Mass Tort and Product Liability (1996); Tr. 10/29/01 at 153.

60. Tr. 10/23/01 at 28–29; Ex. 2000–42; Ex. 2000–43.

61. Tr. 10/23/01 at 31–32; Ex. 2000–9.

62. Tr. 10/23/01 at 32–33; Ex. 2000–45.

63. Exs. 2000–24, 2000–29, 2000–34, 2000–38, 2000–40, 2000–41.

64. Tr. 10/23/01 at 30, 33; Ex. 2000–43; Ex. 2000–44.

65. See Finding of Fact # 34.

estimate, and $6.6 billion for the minimum estimate.[66]

45. He concluded that the net present value of the B & W asbestos liabilities as of July 1, 1998, discounted by a risk-free interest rate of 5.5%,[67] and taking into account the remaining available insurance coverage as of July 1, 1998 was:

(1) preferred estimate: $4.172 billion, and

(2) minimum estimate: $2.0 billion.[68]

Dr. Peterson testified that if only cancer claims were paid, the net present value of the liability at July 1, 1998 under the preferred estimate would be $744 million.[69]

46. Dr. Peterson testified that because any estimation involves some uncertainty, estimates should be viewed as a range.[70] He further stated that because his minimum estimate incorporates the lowest reasonable assumptions on all of the key variables, it would be unreasonable to expect that the present value of B & W's liability at July 1, 1998 net of insurance recoveries would be less than $2.0 billion.[71]

*(2) Dr. Florence's testimony*

47. The FCR's expert, B. Thomas Florence, has a Ph.D. in research design and statistics. He has been employed as an expert witness or consultant to estimate mass tort liabilities for over twelve years, first at Resource Planning Corporation, then at KPMG Peat Marwick, and for the last four years has been the president of ARPC, a consulting firm.[72] Dr. Florence was recognized as an expert in the estimation of asbestos liability claims.[73]

48. Dr. Florence prepared an estimate of the pending and future asbestos claims for B & W as of July 1, 1998, using information in the B & W database that existed as of that date.[74] He did the estimates using both the Nicholson/KPMG method followed by Dr. Peterson and the method developed by epidemiologist Julian Peto.[75] He used both estimation methods and some alternative assumptions to be certain to cover the "waterfront" of reasonable assumptions.[76]

49. Both methods used by Dr. Florence are recognized in the field and described in Dr. Dunbar's book.[77]

50. Using information from the B & W database as to when the claimants were first exposed and how long they were exposed to asbestos, and making an assumption as to the concentration of fiber to which they were exposed, Dr. Florence used the Peto method to calculate what the B & W asbestos-exposed population size

---

**66.** Tr. 10/23/01 at 35–37; Ex. 2000–46; Ex. 2000–47.

Preferred estimate = $11.6 billion = ($424 million + $10.7 billion) × 1.04 to resolve 929,625 claims.
Minimum estimate = $6.6 billion = ($377 million + $5.9 billion) × 1.04 to resolve 709,793 claims.

**67.** Tr. 10/23/01 at 38.

**68.** Tr. 10/23/01 at 40; Ex. 2000–49; Ex. 2000–50.

Preferred estimate = $4.172 billion = $11.6 billion as discounted by 5.5%.
Minimum estimate = $2.0 billion = $6.6 billion as discounted by 5.5%

**69.** Tr. 10/23/01 at 106.

**70.** Tr. 10/23/01 at 30–31.

**71.** Tr. 10/23/01 at 36, 42.

**72.** Tr. 10/23/01 at 214.

**73.** Tr. 10/23/01 at 220.

**74.** Tr. 10/23/01 at 220–21.

**75.** Tr. 10/23/01 at 222–23.

**76.** Tr. 10/23/01 at 224.

**77.** Ex. 1603 at 63, 73–78, 118–32.

had to be to generate as many claims for mesothelioma and lung cancer as there were in the B & W database.[78] Next, he aged the surviving population forward on a year by year basis and, taking the OSHA dose response models that have been published in the literature since the 1980's and standard mortality tables, calculated the number of people who will die of mesothelioma, asbestos-related lung cancer, and other causes in years following the 1998 starting point.[79] He then determined the number of people who will bring claims for mesothelioma and lung cancer against B & W based on the historical claim rate.[80] He performed multiple calculations using alternative calibration periods ranging from two to five years.[81]

51. Dr. Florence admitted that in making the estimate of future asbestos liabilities, the point is to make a reasonable estimate of what is expected going forward because it is not possible to foresee every event in the future that could impact the estimate. So, "all you can do is try to be reasonable given what you know when you make the estimate".[82]

52. Dr. Florence found that historically there was a very high correlation between lung cancer filings and the filings for asbestosis, pleural disease and other cancers.[83] He therefore used that relationship to estimate non-malignant and other

cancer claims to be made against B & W in the future, and made alternate assumptions in calculating the ratio of non-malignant cases to lung cancer cases to reduce the effect of possible year to year variation.[84] Dr. Florence calculated that B & W would receive between 835,000 and 1.14 million claims for all asbestos-related diseases after July 1, 1998.[85]

53. B & W's average settlement values had been increasing in the period from 1993 to mid–1998.[86] Dr. Florence used the figures from 1997 through June 1998 to determine the average amount B & W paid for mesothelioma, lung cancer, other cancer, asbestosis and pleural disease.[87] He estimated the values of the claims with a 3.5% inflation rate and, as an alternative, by an inflation rate determined by using a straight line prediction from B & W's experience of increasing settlement amounts.[88]

54. Dr. Florence then calculated B & W's asbestos liability as the product of: (1) the number of projected future claims, (2) the percentage of claims that B & W historically accepted, and (3) the payment amount for the claims (using his two alternative estimates of the amount paid per claim in future years).[89] He determined that B & W's costs of resolving the asbestos claims ranged from $8.4 billion to $12.4 billion.[90] The minimum liability had a net

78. Tr. 10/23/01 at 225–28.

79. Tr. 10/23/01 at 226–29.

80. Tr. 10/23/01 at 229–230.

81. Tr. 10/23/01 at 231–32.

82. Tr. 10/24/01 at 26.

83. Tr. 10/23/01 at 236.

84. Tr. 10/23/01 at 233–36.

85. Tr. 10/23/01 at 237.

86. Ex. 638; Tr. 10/23/01 at 238.

87. The average B & W settlement amounts for 1997 through mid–1998 broken down by disease were as follows: mesothelioma $55,967; lung cancer $20,432; other cancers $11,117; asbestosis $4,394; and pleural injuries $4,854. Tr. 10/23/01 at 241.

88. Tr. 10/23/01 at 239–40.

89. Tr. 10/23/01 at 240–41.

90. Tr. 10/23/01 at 242.

present value of $3.505 billion, before the application of insurance.[91]

### G. *The defendants' forecasts of B & W's future asbestos liability*

55. The defendants' estimate of B & W's asbestos liabilities as of July 1, 1998 was an estimate based upon a forecast made in March 1997 by Mr. Burkart. The March 1997 forecast, was in turn, based upon a 1993 forecast. B & W introduced extensive evidence as to the history behind the two forecasts, and as to the background of B & W's forecast.

### (1) *B & W began estimating its potential total asbestos liability in 1993/Daniel Gaubert's testimony*

56. Daniel Gaubert joined the McDermott companies in 1971 as a staff accountant. In 1991, he was promoted to corporate controller for McDermott International and its subsidiaries. In 1993, he became the Vice President of Finance for McDermott International and its subsidiaries. In September 1996, he became the Chief Financial Officer of McDermott International and its subsidiaries. He retired in 2001.

57. Both Mr. Gaubert and Mr. Burkart testified that B & W did not estimate potential future asbestos liability before 1993.[92]

58. Mr. Gaubert testified that in December 1993, B & W first estimated potential future asbestos loss contingencies based on advice from Ernst & Young ("E & Y"), which advised B & W that two recent accounting pronouncements narrowed the accounting alternatives for companies with loss contingencies.[93] Mr. Gaubert stated that B & W's outside counsel, Kirkpatrick & Lockhart, and E & Y's own in-house lawyers both advised him that it was not necessary to book an estimate for "unasserted claims where there was no evidence of an injury. . . ." [94]

59. Mr. Gaubert testified that B & W did not follow the lawyers' advice, but chose to follow the advice of its auditors and include future unasserted claims in B & W's estimate of its asbestos liability.[95] Mr. Gaubert explained that this decision was consistent with Financial Accounting Standard ("FAS") No. 5 of GAAP ("Generally Accepted Accounting Principles"), involving the principle of conservatism, under which uncertainties "are reflected in a general tendency toward early recognition of unfavorable events and minimization of the amount of net assets and net income." [96]

60. Mr. Gaubert also testified with respect to Financial Interpretive Bulletin 14 ("FIN 14"), involving loss contingency estimates. Mr. Gaubert testified that although it would have been permissible for B & W to book its asbestos estimate at "the minimum amount in the range," B & W did not do that, instead B & W attempted to book its asbestos liabilities at the point within the range that was the most reasonable one.[97] Mr. Gaubert testified that B & W attempted to estimate, and include in its estimate all of B & W's estimated potential future asbestos liability.[98]

---

**91.** Tr. 10/24/01 at 63–64.

**92.** Tr. 10/25/01 at 13–14, 235.

**93.** Tr. 10/25/01 at 236.

**94.** Tr. 10/25/01 at 237–38; Ex. 5090 at 17128.

**95.** Tr. 10/25/01 at 240; Ex. 5090.

**96.** Tr. 10/25/01 at 241–42; Ex. 3002 at ¶ 82.

**97.** Tr. 10/25/01 at 243–45.

**98.** Tr. 10/25/01 at 242–43.

#### (2) *B & W's 1993 forecast/Louis Burkart's testimony*

61. Mr. Burkart took the lead role in creating B & W's estimate. Mr. Burkart joined the McDermott Risk Management group in 1988. He holds a bachelor's degree in Accounting and a masters degree in Accounting Theory. He is a Certified Public Accountant and a Certified Environmental Risk Manager.[99]

62. In preparing to make an estimate of B & W's asbestos liabilities in December 1993, Mr. Burkart collected a wide range of data and materials. Based on the information he gathered, he narrowed his focus to:

> (1) historical claims data of B & W since 1983 and forward;
>
> (2) historical cost data related to the average cost per claim against B & W from 1983 to 1993;
>
> (3) "intelligence" from Mr. McKnight on what the plaintiff and defense lawyers were saying;
>
> (4) asbestos liability estimates and literature from the Rand Corporation, A.M. Best, National Economic Research Associates, Inc., and Stallard & Manton; and
>
> (5) medical literature regarding disease, latency periods, etc.[100]

Mr. Burkart determined that B & W's "actual claims history" was the most significant piece of information.[101]

63. Mr. Burkart reached two conclusions in preparing his estimate: (1) claims against B & W had peaked in 1989; and (2) claims would likely end or be *de minimus* by 2009 to 2011.[102] Mr. Burkart testified that in preparing his estimate, he extended his projection of asbestos claims to 2020 in an effort to be conservative and to allow for a small amount of claims to come in after 2011.[103]

64. The 1993 forecast projected B & W's asbestos liability to have a total of 155,000 asbestos personal injury claims for the period 1993 to 2020.[104]

65. In projecting the average cost of claims, Mr. Burkart's estimate assumed a 10% inflation rate for the first five years, and 5% thereafter, an inflation rate higher than that used in some of the literature he consulted.[105]

66. Around the time that Mr. Burkart was preparing his estimate in December 1993, a proposed class action settlement was in progress in the *Georgine* case, which sought to settle the claims of individuals who had been exposed to asbestos products against the 20 companies known as the Center for Claims Resolution.[106] When Mr. Burkart prepared his estimate in December 1993, he considered the possible effects of the recent *Georgine* asbestos class action settlement, but did not adjust his original estimate to account for *Georgine* because it was too soon to know what

---

**99.** Tr. 10/25/01 at 6, 8–11.

**100.** Tr. 10/25/01 at 15–20; Ex. 5131 at Ex. 6162.

**101.** Tr. 10/25/01 at 17.

**102.** Tr. 10/25/01 at 15–27, 183–186, 188–190; Ex. 6000.

**103.** Tr. 10/25/01 at 26–27.

**104.** Tr. 10/25/01 at 50–51.

**105.** Tr. 10/25/01 at 29–31.

**106.** The proposed class action was subsequently disallowed by the Third Circuit in an opinion decided on May 10, 1996. *Georgine v. Amchem Products, Inc.,* 83 F.3d 610 (3rd Cir.1996). The disallowance of the proposed class action was affirmed by the Supreme Court on June 25, 1977. *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

effect *Georgine* would have on future claims.[107]

67. In preparing his estimate, Mr. Burkart decided not to use the epidemiological literature for several reasons. First, based on B & W's unique claims settlement process in which it paid claims early and quickly, Mr. Burkart thought that B & W would have already paid and obtained releases for claims before the more serious diseases would develop that would be considered future malignant claims under an epidemiological model.[108] Second, Mr. Burkart. thought that B & W was fundamentally different from companies like National Gypsum and Johns Manville in that B & W used asbestos in only one product—insulation, and it was a bit player whose liability was doubtful.[109] Finally, he thought that the epidemiological models yielded "gigantic" and unreasonable ranges that were not applicable to B & W.[110]

68. After Mr. Burkart developed several forecast scenarios, he reviewed them with Mr. Gaubert, who had an oversight role over the forecasts.[111] B & W's original estimate of its current and future potential asbestos claims was booked in B &

W's March 31, 1994 financial statements in the amount of $1.135 billion.[112]

69. After B & W made final its initial estimate, it monitored the estimate against its actual claims and settlement history, and developments in the asbestos marketplace.

70. From late 1994 through late 1995, B & W experienced a sharp increase in claims, which resulted from the massive nationwide advertising associated with the *Georgine* case.[113]

71. Throughout 1995, B & W remained uncertain about whether the *Georgine* effect represented only an acceleration of claims—due to claimants filing earlier, or whether it also generated claims—due to more people becoming aware of their claims.

72. Mr. Burkart testified that when the *Georgine* spike took place, B & W "received an extra 45,000 claims," so a backlog of claims arose.[114] After the *Georgine* spike, when B & W recognized that some of the claims in the backlog would never be paid, it changed its method of accounting so that any claim that had no activity for three years was considered as an "inactive

---

**107.** Tr. 10/25/01 at 35–38.

**108.** Tr. 10/25/01 at 31–35.

**109.** Tr. 10/25/01 at 31–32. *See also* Ex. 5048.

**112.** Ex. 112 at 6536, 6556.

| Environmental and products liabilities—current | $ 122,361 | (in thousands) |
|---|---|---|
| Environmental and products liabilities—long term | 1,012,819 | |
| | $1,135,180 | |

Note 8 to the financial statements indicates that the estimated liability for pending and future non-employee products liability asbestos claims was $1,122,099,000 as of March 31, 1994.

The discrepancy in the dollar amounts is insignificant to the pending issues. The court will use the amount calculated from financial statements and not Note 8 in order to be consistent with the method that the parties used to calculate the reserve from the June 30, 1988 financial statements. *See infra* at Finding of Fact # 82.

**113.** Tr. 10/25/01 at 39, 54–57, 192–94; Ex. 6001; Ex. 6004.

**110.** Tr. 10/25/01 at 18–19.

**111.** Tr. 10/29/01 at 207.

**114.** Tr. 10/25/01 at 45.

claim" and was not included in Mr. Burkart's analysis.[115]

73. Mr. Burkart did not think that this change in accounting affected the forecast. For the period from 1994 through the first quarter of 1997, the 1993 forecast had estimated that 23,000 claims would be received. Mr. McKnight's numbers, which reported the actual number of claims received, showed that 123,726 claims were received during that period. Using Mr. Burkart's new method of accounting, 118,762 claims were received during that period.[116]

### (3) B & W's March 1997 forecast

74. By March 1997, as part of the ongoing review, Mr. Burkart concluded that *Georgine* had caused both an acceleration in the filing of claims against B & W (as well as other asbestos defendants) and an increase in the total number of claims asserted.[117] Accordingly, Mr. Burkart made a revised forecast of asbestos liabilities in March 1997. The March 1997 forecast increased the total number of claims to be filed from 155,000 to 210,000, thus apparently increasing the total number of claims forecast by 55,000 claims.[118]

75. To account for *Georgine's* claims acceleration effect, B & W shortened the time line of its projection from the year 2020 to the year 2011.[119] This acceleration reflected Mr. Burkart's thinking that under B & W's claims settlement process, B & W had already paid for and obtained releases for many claims that might otherwise be filed in the future.

76. The March 1997 forecast moved many of the claims forecast to the period that had already passed, i.e., to the period from 1993 to 1997. Thus, in March 1997, Mr. Burkart estimated that B & W would receive 64,627 new claims from 1998 to 2011,[120] with new claim filings expected to decline in each future year, from 30,000 in 1997 to 2,000 in 2003, and falling to zero in 2012.[121] The 1993 forecast had estimated that B & W would receive 68,500 new claims from 1998 to 2020.[122] The March 1997 forecast therefore projected fewer numbers of claims to be filed in the future than the previous 1993 forecast.

77. The March 1997 forecast estimated that for the period from 1997 through 2011 there would be 94,627 claims filed at an undiscounted cost of $847,928,438.[123]

78. Mr. Burkart had a tracking method that he used on a monthly basis that monitored the flow of claims coming into B & W and compared them with the previously-made forecast to check the accuracy of the forecast. For the period from March through June of 1998, when Mr. Burkart checked the forecast from 1995 to 1998, there was a downward trend to the actual claims on an annual basis. The forecast also had a decline in claims. Mr. Burkart testified that his forecast tracked the actu-

---

115. Tr. 10/25/01 at 45–46; Ex. 5131 at Ex. 6071. In fact, B & W only paid about 2% of the inactive backlog of claims. Tr. 10/29/01 at 190.

116. Tr. 10/25/01 at 135–40; Ex. 2003; Ex. 519; Ex. 523; Ex. 527; Ex. 663.

117. Tr. 10/25/01 at 47–50.

118. Tr. 10/25/01 at 49–50, 193; Ex. 663.

119. Tr. 10/25/01 at 48–49.

120. Tr. 10/25/01 at 151; Ex. 663.

121. Ex. 663.

122. Ex. 663.

123. Ex. 663. This amount does not include the backlog of $285,721,710.
$1,133,650,148 — 285,721,710 = $847,928,438.

al number of claims filed "really well".[124] A series of contemporaneously created graphs prepared by Mr. Burkart convinced him that B & W's March 1997 forecast closely tracked its actual claims experience.[125]

79. B & W's forecast of declining claims was corroborated by Mr. McKnight and the data from Worldwide. Mr. McKnight explained that there had been "a downtrend in claims received by B & W" for "six or seven" quarters preceding the July 1998 transfers.[126] The downward trend in the number of claims filed against B & W in 1997 and 1998 is reflected in the quarterly reports that Worldwide sent to B & W.[127]

80. Other companies facing asbestos claims experienced a similar reduction in claims during 1997 and 1998.[128]

81. Mr. Burkart testified that the March 1997 forecast of the dollar value of settled claims was consistent with B & W's actual costs. In fact, for 1997 and 1998, B & W slightly overestimated the average cost of settled claims[129] Mr. Burkart testified that as of July 1, 1998, B & W was very confident about its forecast, "we were hitting forecast right on mark for some period of time—for an extended period of time."[130]

82. B & W's March 1997 forecast was in effect at the time of the July 1998 transfers. The reserve on B & W's June 30, 1998 balance sheet for current and future asbestos claims was $866 million.[131]

#### (4) *Dr. Dunbar's testimony as to the March 1997 forecast*

83. The defendants' expert, Dr. Frederick Dunbar, is a Senior Vice President at National Economic Research Associates, Inc. ("NERA"), and was recognized as an expert in the field of statistics, economics, and claims estimation.[132] He reviewed the methodology and inputs that formed the basis of B & W's forecasts, as well as the forecasts themselves. He examined B & W's decision to base its forecast on its own claims history, as well as market data.[133] He reviewed and tested the key assumptions underlying B & W's forecasts, as well as how the forecast compared to actual results.[134] As part of his engagement, he was not hired to, and did not, estimate B & W's asbestos liabilities, although he conceded that he could have made his own estimate if he had been asked and had enough time to complete the estimation.[135]

124. Tr. 10/25 at 55–56; Ex. 5072 at 38524.

125. *See* Ex. 5072.

126. Tr. 10/22/01 at 163.

127. Exs. 528, 529, 530, 531, 532, 6080a.

131. Ex. 116 at 864.
Environmental and products liabilities—current
Environmental and products liabilities—long term

132. Tr. 10/29/01 at 7, 9.

133. Tr. 10/29/01 at 56–57.

134. Tr. 10/29/01 at 57–66, 72–73, 77.

128. Ex. 5131 at Ex. 6097—Foster–Wheeler, Owens–Corning, UNR, W.R. Grace.

129. Tr. 10/25/01 at 58–60; Ex. 6065.

130. Tr. 10/25/01 at 60–61.

| | |
|---|---|
| $156,683 | (in thousands) |
| 709,237 | |
| $865,920 | |

135. Tr. 10/29/01 at 169–70. Dr. Dunbar was first engaged by the defendants in 1999, but was not retained for this fraudulent conveyance litigation until July 2001. Tr. 10/29/01 at 16, 168–69.

He noted the importance of the claims against B & W peaking in 1995, and that they had been on a downward trend for the 14 quarters following that date.[136] Dr. Dunbar concluded that the March 1997 forecast was reasonable when made, and as of July 1998, it was still reasonable because the forecast was still tracking the actual claims numbers received for the period after March 1997.[137]

84. Dr. Dunbar stated that there are various methodologies for determining future asbestos liabilities, and that as of July 1, 1998, there was no requirement that a forecast be an epidemiology-based model, such as that used by Dr. Peterson and Dr. Florence, because there has never been only one accepted method for estimating future liability.[138]

### H. Plaintiffs' criticisms of B & W's March 1997 forecast

85. The plaintiffs, of course, criticized the defendants' forecast as being too low. The plaintiffs point out that by the first quarter of 1997 when Mr. Burkart prepared the March 1997 forecast, the information available to B & W showed that it had already received 123,726 claims for the period from calendar year 1994 through the first quarter of 1997.[139] Even subtracting the inactive claims, resulted in claims received by B & W of 118,762 for that period.[140] By contrast, the 1993 forecast had projected that B & W would receive 68,000 claims for the period from calendar year 1994 through the first quarter of 1997.[141] On either basis, the actual result of number of claims filed—either 123,726 or 118,762—far exceeded the forecast number of 68,000.[142]

86. Use of Mr. McKnight's reports of actual new claims received shows that B & W had received 71,157 new claims in 1996 and 1997 alone.[143] Even under Mr. Burkart's new method of subtracting the inactive claims, B & W received 64,511 claims during those two years.[144] Under either set of figures, for the 1997 estimate to be accurate, B & W could receive only as many claims, over the entire term of the projection after the year in which it was made, as it had received in just two years, 1996 and 1997.[145]

87. The plaintiffs contend that the financial implications of the 1997 estimate were similarly rosy. During the fiscal year ended March 31, 1998, B & W had paid $196 million dollars to resolve asbestos claims.[146] In the first half of 1998, it was paying at an annualized rate of approximately $240 million,[147] while the reserve on its financial statements, intended to cover all current future claims, was just $866 million.[148] The reserve, therefore,

---

136. Tr. 10/29/01 at 77.

137. Tr. 10/29/01 at 73, 81–82. *See* Ex. 5131 at Ex. 6064 and Ex. 5131 at Ex. 6181.

138. Tr. 10/29/01 at 21, 85, 89–90.

139. Tr. 10/25/01 at 137–38. Of this amount, 9,504 was received in the first quarter of 1997, resulting in 114,222 claims filed from 1994 through 1996.

140. Tr. 10/25/01 at 138–140;

   33,273  + 44,407 + 31,783 + 9,299 = 118,762

141. Tr. 10/25/01 at 132–33, 137; Ex. 663.

142. Tr. 10/25/01 at 141.

143. Tr. 10/25/01 at 171.

144. Tr. 10/25/01 at 171–72.

145. Tr. 10/25/01 at 172; Ex. 638; Ex. 663.

146. Finding of Fact # 27.

147. *Id.*

148. Finding of Fact # 82.

was less than four years' worth of payments at the then-current rate.

88. Mr. Burkart's rationale for forecasting such a sharp decrease in claims was his belief that, instead of following the "long tail" pattern of incidence of asbestos-related diseases, B & W's claims would come to an end "quickly and abruptly".[149] His reasoning was that only a limited number of people had been exposed to B & W boilers, and that, in a process he described as "mining," plaintiffs' lawyers had already mass screened all B & W locations, identified most of the potential claimants, filed claims for them against B & W, and given releases in exchange for relatively modest payments, predominately for claims of pleural illness or asbestosis—not cancers.[150]

89. Dr. Peterson testified that the "mining" analysis and the projection that claims against B & W would virtually stop within a few years was inconsistent with the facts that:

(1) hundreds or thousands of workers worked at any particular time at each of the sites where B & W had boilers;[151]

(2) the numbers potentially exposed were increased by asbestos workers' job turnover;[152] and

(3) B & W had by 1998 settled with only about 270,000 people, while the estimated population in the United States occupationally exposed to asbestos was 14 million.[153]

In addition, Mr. Burkart acknowledged that B & W's settlement program could not get releases from people who had not yet manifested a disease.[154] The latency period for asbestos-related diseases is up to 40 years, so that the workers who would become ill and file claims in later years generally had no symptoms in the 1990's and constituted a different population from those with whom B & W had settled prior to 1997; thus the future claimant pool would not be diminished by the releases obtained in the 1990's.[155]

90. The plaintiffs also questioned Mr. Burkart's expertise in making estimates, pointing out that:

(1) Mr. Burkart had no experience in mass tort estimation when he made the 1993 estimate;[156]

(2) the only schooling to learn about asbestos claims that he identified having received at any time before 1998 was attendance at industry meetings;[157] and

(3) he testified that he read a few published materials in connection with the 1993 estimates.[158]

91. Burkart based his 1993 estimate on the assumption that claims against B & W would follow a "normal distribution" or "bell curve" distribution with 1989 claims as the peak.[159] His 1997 estimate, made to reflect the *Georgine* effect, simply shifted the peak forward to the 1994–95 *Georgine* "spike."[160] Yet, plaintiffs point out that even Dr. Dunbar testified that he had nev-

149. Tr. 10/25/01 at 32.

150. Tr. 10/25/01 at 31–32; 144.

151. Ex. 1506; Ex. 1507.

152. Tr. 11/2/01 at 25–26.

153. Tr. 11/2/01 at 61–62.

154. Tr. 10/25/01 at 147.

155. Tr. 11/2/01 at 59–60, 62–63.

156. Tr. 10/25/01 at 14.

157. Tr. 10/25/01 at 67–68.

158. Tr. 10/25/01 at 18–19.

159. Tr. 10/25/01 at 143, 213.

160. Tr. 10/25/01 at 48, 141; Tr. 10/29/01 at 194.

er used a bell curve in projecting asbestos claims,[161] or in determining the turning points in incidence of disease,[162] or for making an estimate of claims as distinct from incidence of disease.[163] Dr. Dunbar admitted that his book did not mention a normal curve.[164]

### I. *Dr. Dunbar's criticisms of the Dr. Peterson and Dr. Florence estimates*

92. Dr. Dunbar disagreed with the Dr. Peterson and Dr. Florence estimates on several bases. His fundamental criticism was that the plaintiffs' estimates were derived, in part, from epidemiological forecasts in that they linked future claims against B & W to the Nicholson/KPMG projections of nationwide asbestos-related cancers, which he testified was not valid as to B & W. He stated that in order to apply the epidemiological models sufficient data is needed to determine: (1) the size of the population exposed to B & W's product; (2) the dose or level of intensity of that exposure; and (3) a reliable diagnosis of an asbestos-related disease.[165] In B & W's case, however, all of that data was lacking.[166] Both Dr. Peterson and Dr. Florence admitted that they did not determine: (1) the population exposed to B & W asbestos; (2) the dose received by this population; and (3) whether this dose caused disease.[167] Dr. Dunbar testified that without the requisite data establishing expo-

sure to B & W's products, dose, and causation, it is not possible to make a scientific epidemiology-based forecast and make a predicted disease curve for B & W.[168]

93. Dr. Dunbar also criticized the Peterson and Florence models' reliance on the "propensity to claim" ratios.[169] He testified that the models did not quantify statistically the effect of non-epidemiological factors, such as litigation developments.[170]

94. Dr. Dunbar testified that with respect to non-malignant claims, the plaintiffs' experts had even less information from which to generate their estimates. There are no epidemiological or scientific studies of the incidence of non-malignant asbestos-related diseases.[171] Thus, Drs. Peterson and Florence could not determine a "propensity to sue" ratio with respect to non-malignant claims.[172] Drs. Peterson and Florence thus assumed that the percentage of potential non-malignant claimants who will actually file a claim against B & W will be the same as the "propensity" ratio calculated with respect to malignant claimants.[173] Drs. Peterson and Florence assumed that the ratio will remain constant into the future, despite the fact that there have been significant fluctuations in the ratio for B & W in the past, and that the ratio varies widely from

161. Tr. 10/29/01 at 113.

162. Tr. 10/29/01 at 122–23.

163. Tr. 10/29/01 at 124, 127.

164. Tr. 10/29/01 at 108–09, 113, 127.

165. Tr. 10/29/01 at 23–24; Ex. 5131 at Ex. 6164; Ex. 5131 at 6163(a).

166. Tr. 10/29/01 at 36.

167. Tr. 10/23/01 at 115–18; Tr. 10/24/01 at 9–12.

168. Tr. 10/29/01 at 36–37; Ex. 5131 at Ex. 6168.

169. *See* Finding of Fact ## 35, 38.

170. Tr. 10/29/01 at 40.

171. *See* Finding of Fact # 39.

172. Tr. 10/23/01 at 94–95, 105.

173. Tr. 10/23/01 at 96–97.

state to state.[174] Dr. Dunbar's conclusion was that the Peterson and Florence estimates were not based in science, and were too subjective.

95. In response to Dr. Dunbar's criticisms, Dr. Peterson explained that company-specific epidemiological data are not available because workers exposed to asbestos are exposed to asbestos from many sources and many defendants' products. He also testified they are not necessary for a valid projection in view of the similarity of the B & W population to the general population.[175] He pointed out that in the *National Gypsum* case, Dr. Dunbar himself used epidemiological forecasts without company-specific data as one of the methods to estimate future asbestos liabilities.[176]

96. Dr. Peterson and Dr. Florence also testified that non-epidemiological factors were accounted for in their determination of potential changes in settlement values, the ratio of non-cancer to cancer claims, and the overall propensity to file, based on their analysis and experience of the non-medical factors that affect these behaviors.[177]

## J. *B & W's financial statements*

97. B & W's booked asbestos liability shown on its financial statements on the transfer date was based only on the March 1997 projection. On its June 30, 1998 balance sheet, B & W's total reserve for both current and future asbestos liabilities (not including insurance and not reduced to present value) was $866 million.[178]

98. B & W's audited and unaudited financial statements show that it was solvent at all times. B & W's pre- and post-transfer books and records were audited by E & Y and PricewaterhouseCoopers ("PwC").

99. E & Y concluded that the financial statements for the period ending March 31, 1998, the last audited financial statements before the transfers, were prepared in conformity with GAAP and "present[ed] fairly, in all material respects, the consolidated financial position of The Babcock & Wilcox Company at March 31, 1998." [179] These financial statements show B & W solvent by $756 million on a book value basis.[180]

100. B & W's asbestos liability estimate was audited by E & Y from 1994 through 1998. As E & Y explained in its reports to McDermott International's Audit Committee, management's estimate of potential asbestos liability was one of the "principal areas of audit emphasis" that received a "[h]igh level of effort. . . ." [181] A March 31, 1998 report by E & Y examined B & W's historical claims received and claims paid over the previous five years, forecasted versus actual results, the basis for B & W's forecast, B & W's use of "active claims" in its forecasts, and B & W's insurance receivable.[182] The report

---

174. Tr. 10/23/01 at 74, 98–101; Ex. 5131 at Ex. 6094a-c and 6095a. For example, Dr. Dunbar testified that Mississippi, as a "high ratio state", has about 30 times more non-malignant claimants relative to malignant claimants than California. Tr. 10/29/01 at 51.

175. Tr. 11/2/01 at 25–27.

176. Tr. 10/29/01 at 157.

177. Tr. 11/2/01 at 36–43; Tr. 10/24/01 at 20–24.

178. Finding of Fact # 82.

179. Ex. 115 at 6618.

180. Ex. 115 at 6620.

181. Ex. 803 at 33, 38.

182. Ex. 5033.

stated that the March 1998 forecast "represents management's best estimate of future claims activity", and concluded "that the asbestos liability and the related insurance recoverables are fairly stated in accordance with generally accepted accounting principles at March 31, 1998." [183]

101. E & Y's audit team also had its actuarial department review B & W's asbestos liability estimate for the years 1994 through 1998. The E & Y actuaries were requested to conduct a "limited review" of B & W's asbestos liabilities. Reports dated April 29, 1994 through May 22.1998 by the E & Y actuaries concluded that McDermott International's booked reserve of B & W's asbestos claims were either "reasonable" or "not unreasonable." [184] Each report from the E & Y actuarial group between 1995 and 1998 emphasized the limited nature of their review and recommended a more detailed actuarial review for the next year's audit. [185] For example, the report of May 22, 1998 of the E & Y actuaries stated:

> Since the dollar amount of losses paid in the current year was consistent with [McDermott International's] projections, we have no reason to conclude that the current estimated liability is any less reasonable than was the case in prior years, despite the fact that the individual assumptions within the model are not necessarily consistent with actual experience. We therefore conclude that the estimated liability is not unreasonable, but subject to a high degree of uncertainty. We also continue to recommend

that a more rigorous analysis of B & W's asbestos exposures be undertaken to assist in reducing the level of uncertainty associated with this significant liability. [186]

No such detailed review was ever done. [187]

102. Gary Ciardiello, the E & Y actuary involved in each audit between 1994 and 1998, testified by deposition that the E & Y Actuarial Services Group's annual review of the B & W asbestos liability estimate was limited rather than exhaustive and that the group relied on the information provided by the company as opposed to conducting an independent actuarial review. [188] Mr. Ciardiello also agreed that E & Y's actuarial review consisted solely of "taking the information you received from the company, the explanations you received from the company, and then using various statistical methodologies to test whether that information was consistent with the company's forecast." [189] Mr. Ciardiello did not understand the B & W settlement process, and mistakenly believed that B & W resolved most of its asbestos claims in the courtroom. [190]

103. Mr. Barry Franklin, who reviewed Mr. Ciardiello's work in 1997 and 1998, similarly testified by deposition that E & Y's actuarial review was limited in scope and was not an independent actuarial evaluation of B & W's estimates. [191] E & Y made no use of asbestos-related epidemiological studies in its review, [192] even though its most senior actuary, Mr. Franklin, testified it would have been appropriate for

183. Ex. 5033 at 198, 200.

184. Exs. 5024, 5026, 5028, 5036, 5037.

185. Exs. 5026, 5028, 5036, 5037.

186. Ex. 5037.

187. Ciardiello Depo. 77, 99–100, 174–75.

188. Ciardiello Depo. 26–27, 109–111.

189. Ciardiello Depo. 111.

190. Ciardiello Depo. 86.

191. Franklin Depo. 45, 52, 85, 86–87, 101.

192. Ciardiello Depo. 110–111.

an actuary to take epidemiological information about a disease into account in performing an actuarial estimate of future claims for that disease.[193]

104. PwC independently audited the B & W financial statements for the period ending March 31, 1999, the first audited financials prepared after the transfers. PwC concluded that the post-transfer financial statements were prepared in conformity with GAAP and presented fairly, in all material respects, the financial position of B & W at March 31, 1999. The audited balance sheet at March 31, 1999 shows B & W solvent after the transfers by $136 million on a book value basis.[194]

### K. *Amounts available to B & W to pay future asbestos liabilities*

105. As discussed earlier, the parties stipulated that the undiscounted amount of insurance coverage available to B & W as of July 1, 1998 to pay for or reimburse asbestos personal injury claims was $1.485 billion.[195] Mr. Gaubert testified that this figure included over $800 million in additional, unreserved products liability insurance that had not yet been used.[196]

106. The parties also stipulated that the enterprise value of B & W on July 1, 1998, excluding asbestos liability and the untapped insurance was $650 million.[197]

107. Mr. Gaubert testified that because the $650 million is an enterprise value, if the net reserve for asbestos liability recorded on B & W's books and the small amount of debt that B & W had is subtracted from this $650 million, then B & W's book value would be increased by the

resulting $500 million.[198] The court is not convinced by this testimony. The defendants failed to show where the $500 million reserve figure came from, and why it should be added back in.

108. Mr. Gaubert further testified that the $650 million enterprise value had some $400 million worth of taxes embedded in it because the $650 million figure assumes that B & W paid taxes on its future earnings. He stated that B & W would be able to take a tax deduction on any claims that it paid over and above what B & W was reimbursed in insurance. Therefore, there would be an additional $400 million in value as of July 1, 1998 that would be available to pay future asbestos claims.

109. The court accepts Mr. Gaubert's testimony to the extent that if the additional, untapped insurance of $800 million and the $400 million tax savings are added, there would be an additional amount of approximately $1.2 billion in resources available to B & W over and above what was provided in the financial statements to pay future asbestos claims.

110. Dr. Dunbar testified that B & W could have had $2 billion more in asbestos claims than B & W forecast, and there still would have been value left in the company according to the company's books.[199] His testimony on this issue was not specific, and was not backed up with any data or exhibits.

111. The court finds that B & W's future asbestos liabilities would have had to have been greater than $1.85 billion in

---

193. Franklin Depo. 102–03.

194. Ex. 117 at 6648.

195. *See* Finding of Fact # 30.

196. Tr. 10/29/01 at 220–21.

197. *See* Finding of Fact 29.

198. Tr. 10/25/01 at 234; Tr. 10/29/01 at 222.

199. Tr. 10/29/01 at 71.

order for B & W to be insolvent as of July 1, 1998.[200]

## L. *The solvency of B & W*

112. As shown by the conflicting expert testimony, estimating future asbestos liabilities is a difficult task. The difficulties are compounded in estimating B & W's future asbestos liabilities in that they are one of the more minor asbestos defendants, and given its settlement strategy, there are no judgments or verdicts available from which to make projections.

113. The court is persuaded by the testimony of Dr. Dunbar that as of July 1, 1998, the defendants' assumptions and forecasts were reasonable (or at least not unreasonable), such that B & W was solvent on that date. Although Dr. Dunbar did not make his own estimate, his testimony pointing out the difficulties in applying the assumptions made by Drs. Peterson and Florence to B & W's situation was noteworthy. On the other hand, given B & W's settlement history, and the asbestos litigation posture in the United States, it is clear that determining asbestos liability for an asbestos defendant is far from completely scientific. The asbestos problem is obviously very complex, due to the numerous asbestos defendants, possibilities of joint and several liability, differences in laws among the states, problems in determining causation of asbestos diseases, and other problems noted by numerous courts that have determined asbestos issues.[201] The court may accept the methodologies used by Drs. Peterson and Florence in a future valuation/estimation hearing for a different purpose. On the present issue, however, due to the difficult nature of

estimating in 2002, the future asbestos liabilities as of July 1998, their testimony does not persuade the court that B & W was insolvent on July 1, 1998.

114. The court is persuaded that B & W's projections of asbestos liability, while perhaps appropriate for GAAP purposes, do not reflect the correct actual amount of B & W's future asbestos liabilities that were predictable as of July 1, 1998. The court is persuaded that B & W management, including Mr. Burkart and Mr. Gaubert were in good faith, and did not purposefully underestimate liability. Nevertheless, B & W's projections are also subject to the difficulties inherent in estimating future asbestos liabilities. Although B & W's projections may have been reasonable under GAAP, the assumptions with the benefit of hindsight proved to be overly conservative. B & W's assumption that the claims against it would go down in the future because B & W was ahead of the curve, and that almost all potential claims would have already been filed is problematical.

115. The court rejects the defendants' contention that E & Y's work validates the dollar amount of B & W's asbestos liability estimate. E & Y's actuarial review was limited in nature, considered only the information provided by B & W, and was not intended to provide a basis for a court to determine the actual magnitude of the asbestos liabilities.

116. Given the financial cushion available to B & W in the amount of funds available to pay additional asbestos claims as of July 1, 1998, the court finds that the plaintiffs have not carried their burden of

---

**200.**

| | |
|---|---|
| enterprise value | $ 650 million |
| tax savings | 400 |
| available insurance | 800 |
| | $1,850 |

**201.** *See, e.g., Georgine v. Amchem Products, Inc.,* 83 F.3d 610 (3rd Cir.1996); *Jackson v. Johns–Manville Sales Corp.,* 750 F.2d 1314, 1336 app. (5th Cir.1985)(discussing the dimensions of the asbestos litigation explosion).

proving that B & W was insolvent as of that date.

## III. CONCLUSIONS OF LAW

### A. The Revocatory Action—in general

The sole question before the court is whether B & W was insolvent on July 1, 1998 under the law applicable to Louisiana revocatory actions. The court emphasizes that this opinion and this evaluation of B & W's future asbestos claims applies only to that question.[202]

Section 544(b) of the Bankruptcy Code authorizes a trustee to avoid "any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under *applicable law* by a creditor holding an unsecured claim that is allowable under ... this title."[203] The applicable law in this instance is the Louisiana revocatory action.

The revocatory action, codified in Louisiana Civil Code article 2036, provides:

> An obligee has a right to annul an act of the obligor, or the result of a failure to act of the obligor, made or effected after the right of the obligee arose, that causes or increases the obligor's insolvency.[204]

Louisiana Civil Code article 2037 defines insolvency:

An obligor is insolvent when the total of his liabilities exceeds the total of his fairly appraised assets.[205]

The definition of insolvency under the Bankruptcy Code is virtually identical—a debtor is insolvent under the Code if its financial condition is "such that the sum of [its] debts is greater than all of [its] property, at a fair valuation."[206]

### B. B & W's legal liability for asbestos personal injury claims

■ The defendants argue that the plaintiffs offered no proof that establishes B & W's legal liability for asbestos personal injury claims. The defendants further submit that the plaintiffs' reliance on B & W's settlement process as a substitute for proof of legal liability is contrary to law, and is in violation of Rule 408 of the Federal Rules of Evidence.

This argument is flawed. B & W itself treated its future/prospective asbestos liabilities as liabilities on its books since 1994.[207] Indeed, B & W filed its voluntary Chapter 11 petition because of the numerous and increasing numbers of asbestos claims filed against it. If the defendants do not have any future asbestos obligations, then the entire Chapter 11 case is

---

**202.** *See Baybank–Middlesex v. Ralar Distributors, Inc.,* 69 F.3d 1200, 1204 (1st Cir.1995), *citing, In re Richardson,* 97 B.R. 161, 162 (Bankr.W.D.N.Y.1989) ("valuation of creditor's collateral made for one purpose is not *res judicata* as to later valuation in same bankruptcy case for different purposes"); *In re National Gypsum Co.,* 139 B.R. 397, 405 (N.D.Tex.1992)("Estimation can serve several purposes."); *In re Hudson,* 260 B.R. 421, 433 (Bankr.W.D.Mich.2001)("[I]f two valuations regarding the same collateral are for different purposes, the law of the case doctrine may not apply."). *See also* David S. Salsburg and Jack F. Williams, *A Statistical Approach To Claims Estimation In Bankruptcy,* 32 Wake

Forest L.Rev. 1119, 1130 (1997)(Estimations may be made for purposes of voting, assessing plan feasibility, establishing the contours of a trust fund proposed under a plan, or to establish the actual dividend to be received by a creditor).

**203.** 11 U.S.C. § 544(b). [Emphasis added].

**204.** Louisiana Civil Code Art. 2036.

**205.** Louisiana Civil Code Art. 2037.

**206.** 11 U.S.C. § 101(32)(A).

**207.** *See* Finding of Fact ## 68, 82.

subject to dismissal.[208] The court is not required to pretend for purposes of determining insolvency that the very obligations that bring B & W before the court were not obligations at all in 1998.

B & W faced real legal liability on asbestos claims in 1998. The May 22, 1998 report by the E & Y actuaries recommended a more rigorous analysis of B & W's asbestos exposures to assist in reducing the level of uncertainty associated *"with this significant liability"*.[209] Further, more than a decade before these transfers, a federal court had stated: "[L]itigation based on asbestos exposure is by far the largest area of products liability litigation in the United States today."[210] Companies such as B & W that used asbestos in their products were repeatedly being held liable to workers handling their products, and juries were, as noted by B & W, awarding large verdicts against asbestos defendants who risked litigation.[211]

■ Finally, defendants' argument that Rule 408 of the Federal Rules of Evidence prevents the court from considering B & W's prior settlement history and protocol is also without merit. Rule 408 prohibits use in trial of evidence of a settlement "to prove liability for or invalidity of the claim or its amount."[212] Rule 408 applies to the use of evidence of compromise to prove the validity or invalidity of the claim that is the subject of the compromise.[213] Thus, a particular plaintiff in a tort case against a particular defendant cannot establish liability in that case by using evidence of attempts to settle that case, or evidence of verdicts that other plaintiffs have won against the defendant in other cases. When settlement negotiations and terms explain and are part of another dispute, however, they are often admitted to allow the trier of fact to "understand the case".[214]

Consequently, the court, in determining whether B & W's future estimation of tort liabilities was reasonable, can consider both settlements by B & W and other case histories against other asbestos defendants as part of the grounds for its decision. To do otherwise would close one's eyes to the realities that existed in 1998. At that time B & W knew it had a significant future

**208.** *In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir.1999)(Chapter 11 petition that lacked a valid reorganizational purpose and was not filed in good faith was dismissed). The court further notes that in this case when the debtors first filed for bankruptcy protection, the court authorized the debtors to pay many of their debts, other than asbestos liability debts, under the "necessity of payment rule". The so-called "doctrine of necessity" or "necessity of payment rule" permits bankruptcy courts in limited circumstances to authorize payment of prepetition claims "if such payment [is] essential to the continued operation of the debtor." *NextWave Personal Communications Inc. v. F.C.C.*, 254 F.3d 130, 136 (D.C.Cir. 2001), citing, *In re Just For Feet, Inc.*, 242 B.R. 821, 825 (D.Del.1999); *In re Boston and Maine Corp.*, 634 F.2d 1359, 1376 (1st Cir. 1980); *In re Equalnet Communications Corp.*, 258 B.R. 368 (Bankr.S.D.Tex.2000).

**209.** *See* Finding of Fact # 101 [emphasis added].

**210.** *Wilson v. Johns–Manville Sales Corp.*, 107 F.R.D. 250, 251 (S.D.Tex.1985), citing, *Jackson v. Johns–Manville Sales Corp.*, 750 F.2d 1314, 1336 app. (5th Cir.1985).

**211.** Ex. 526.

**212.** Fed.R.Evid. 408.

**213.** 23 Wright and Graham, Fed. Practice and Procedure § 5306, at 215–16 (1980). *See also Broadcort Capital Corp. v. Summa Medical Corp.*, 972 F.2d 1183, 1194 (10th Cir.1992)(evidence from prior settlement discussions admissible because it "related to an entirely different claim" from the claim that was the subject of the negotiations).

**214.** 2 Weinstein, Fed. Evidence § 408.08[5], at 408–35 (2001).

liability for future asbestos claims,[215] and made what it argues were reasonable estimates that were included on its financial statements. When these estimates proved in 2000 to be too low, B & W chose Chapter 11 proceedings as the only alternative to deal with this significant future liability. Defendants' argument in 2002 that these significant liabilities do not constitute obligations at all under the Louisiana law of revocatory actions falls on deaf ears.

The court concludes that the plaintiffs have shown the existence of future asbestos liabilities by the defendants as of July 1, 1998. The question remaining for determination is the amount of the future liabilities, and if the amount was so large as to cause B & W to be insolvent on that date.

C. *Including future claims in a solvency analysis under the revocatory action*

█ The defendants also argue that B & W was not insolvent because the unasserted contingent future claims of individual asbestos claimants do not constitute liabilities for the purpose of determining solvency under the revocatory action. In support of this argument, the defendants cite several cases, including: *Jefferson Bank & Trust Co. v. Fabre,*[216] *Videocipher v. Satellite Earth Stations, SESE, Inc.,*[217] and *Reading & Bates Construction Co. v. Baker Energy Resources Corp.*[218]

█ The court disagrees with the defendants' argument. Comment (f) to Civil

Code article 2036, states in pertinent part that "[a]n obligee's claim does not have to be liquidated to judgment to be considered an anterior debt."[219] In *Holland v. Gross,*[220] cited in Comment (f), two people died following a car accident caused by the minor son of the defendant. The defendant granted a *dation en paiement* in favor of one of his creditors, which transferred real estate to that creditor. The plaintiffs from the car accident then filed a revocatory action against the creditor and the subsequent transferees of the creditor. The court annulled the *dation en paiement,* finding that the defendant was insolvent. The court reasoned that:

> . . . reference is often made to the plaintiff's monetary demand as an unliquidated debt or claim, which is sought to be reduced to judgment, the highest form of liquidated obligation. Yet, a judgment is not a debt in the strict sense of the term. It is but the recognition of the pre-existence of a debt or obligation. In *Dominique Lalanne v. Jacob U. Payne et al.,* 42 La.Ann. 152–155, 7 So. 481, 482, the court declared: "We have frequently held that debts and obligations are not created by judgments of court, but only recognized by them, and rendered executory; that they confer no new rights, only confirm those already in existence.
>
> . . .
>
> The moment an actionable wrong is done to one person through the fault of

---

**215.** As discussed above, B & W realized this as early as 1993 when it made its first estimate of contingent liability and set up a reserve in its 1994 financial statements. *See* Finding of Fact # 68.

**216.** 433 So.2d 877, 879 (La.App. 5th Cir. 1983).

**217.** No. CV 88–2815, 1992 WL 208037 (W.D.La.1992).

**218.** 698 So.2d 413, 423 (La.App. 3rd Cir. 1997), *writ denied,* 706 So.2d 976 (La.1998).

**219.** Civil Code art. 2036, Comment (f), *citing, Holland v. Gross,* 195 So. 828 (La.App. 2nd Cir.1939); *Ventrilla v. Tortorice,* 160 La. 516, 107 So. 390 (1926).

**220.** 195 So. 828 (La.App. 2nd Cir.1939).

another, there arises automatically an obligation on the part of the wrongdoer to repair the damage, the measure of which is confided to the judicial branch of the government for determination. In such a case, so far as the obligation to pay (repair) is concerned, it is as certain and definite as that arising in any other manner."[221]

Thus, *Holland* recognized that a debt need not be reduced to a judgment to be considered a debt under the revocatory action.

This point was also made in the case of *Lewis v. Hood*,[222] which stated:

Article 2036 refers not to a judgment or liquidated debt, but to a "right of the obligee." La. C.C. art. 2036 & comment (f). We find no support for the Hoods' argument that the revision contains a mandate, or inference, that the debt must be liquidated, that is, determined or fixed, before it can serve as a basis for a revocatory action.

The cases cited by the defendants are distinguishable. In *Jefferson Bank & Trust Co. v. Fabre*,[223] the court determined that the debtor could not include as an asset the speculative value of his interest in pending lawsuits in which he was a plaintiff. The case of *Videocipher v. Satellite Earth Stations, SESE, Inc.*,[224] held that the value of alleged counterclaims could not be included as an asset. These cases, involving whether lawsuits may be included as assets, shed little light on the present issue of whether potential future liabilities should be included as liabilities in a solvency analysis under the revocatory action.

The closest case on this point cited by the defendants is *Reading & Bates Construction Co.*,[225] which is relied on for the proposition that a claim "already reduced to a liquidated sum was not sufficiently certain to count as a liability in measuring solvency in a Louisiana revocatory action."[226] *Reading & Bates* does not apply to the present case, however, because the only financial figure that the plaintiff in *Reading* had provided to the trial court was the "full valuation" of a referee's recommendation in Canadian dollars and "no alternative discounted valuation was presented."[227] In the pending case there was extensive evidence as to the discounted value of B & W's future asbestos liabilities.

The Official Committee of Unsecured Creditors cites the case of *Traina v. Whitney National Bank*,[228] for the proposition that "the obligation must be 'actual and present' to render performance".[229] In *Traina*, the borrower had entered into two credit line accounts, but had not yet borrowed under the credit line. The United States Fifth Circuit Court of Appeals held that because the borrower was not bound to render performance on the credit line—payment of the debt—until it had actually

---

**221.** *Holland*, at 833 [citations omitted].

**222.** 721 So.2d 1078, 1080 (La.App. 1st Cir. 1998). *See also Traina v. Whitney National Bank*, 109 F.3d 244 (5th Cir.1997), *citing, Thomassie v. Savoie*, 581 So.2d 1031, 1034 (La.App. 1st Cir.1991)("Legislature's substitution of 'obligor' and 'obligee' for 'debtor' and 'creditor' in 1984 revision was intended to expand scope of revocatory action to cover unliquidated claims").

**223.** 433 So.2d 877.

**224.** No. CV 88–2815, 1992 WL 208037 (W.D.La.1992).

**225.** 698 So.2d 413.

**226.** Pl. 243, *Defendants' Consolidated Trial Brief*, at 31.

**227.** *Id.* at 423.

**228.** 109 F.3d 244 (5th Cir.1997).

**229.** Pl. 293 at 3.

incurred the debt, the credit agreements did not constitute an "obligation" as defined by the Louisiana Civil Code.[230] *Traina,* which involves outstanding credit lines on which no borrowing had yet taken place, does not support the defendants' position.

■ The defendants' position ignores the Louisiana jurisprudence that the moment an actionable wrong is done to one person through the fault of another, there arises automatically an obligation on the part of the wrongdoer to repair the damage. In *Cole v. Celotex Corp.,*[231] the Supreme Court of Louisiana held that "... the key relevant events giving rise to a claim in long-latency occupational disease cases are the repeated tortious exposures resulting in continuous, on-going damages, although the disease may not be considered contracted or manifested until later." The recent case of *Bonnette v. Conoco, Inc.,*[232] though not a revocatory action, upheld a plaintiff's contention that "inhaling one fiber of asbestos is an actionable harm or injury". Because B & W's alleged liabilities arise from the future claimants' exposure to asbestos, the actionable wrong occurs at the time of exposure to the asbestos in and around the B & W boilers, even though the disease is not manifested until years later.

Based upon these authorities, and particularly, Comment (f) to Civil Code Article 2036 and the *Holland* and *Lewis* cases, the court holds that the future liabilities of B & W that are not yet reduced to judgment must be included in determining the solvency of the defendants under the revocatory action.

### D. *Plaintiffs' burden of proof*

■ The plaintiffs argue that whether B & W was insolvent at the time of the transfers depends on an *objective* estimation of its future asbestos liabilities, not the asserted subjective reasonableness of its management's contemporaneous estimates. The defendants argue that the plaintiffs have the burden of proving that B & W acted negligently in estimating its asbestos liabilities.

The court agrees with the plaintiffs' position. Several substantive changes to the law on the revocatory action were made in 1984.[233] The primary change made was "that the fraud element of the prior law [was] abandoned for the objective test of whether the act causes or increases the obligor's insolvency."[234] Similarly, Comment (b) to Civil Code Article 2036, states that "... [t]he criteria for a revocatory action is an objective one. It may be satisfied by an act done negligently as well as intentionally."[235] Consequently, the court

---

**230.** *Traina,* 109 F.3d at 247.

**231.** 599 So.2d 1058, 1066 (La.1992).

**232.** 801 So.2d 501 (La.App. 3rd Cir.2001).

**233.** The requirements of the revocatory action under the former law were: "(1) insolvency of the debtor; (2) injury to the creditor; (3) intent to defraud the creditor and (4) preexisting and accrued indebtedness." *Warren v. Bergeron,* 636 So.2d 1013, 1016 (La.App. 1st Cir.1994), *citing, Copher v. Ormond Builders, Inc.,* 467 So.2d 1344, 1346 (La.App. 5th Cir.1985).

**234.** *Warren,* 636 So.2d at 1016 (La.App. 1st Cir.1994), *citing,* Louisiana Civil Code Article 2036, comments (a) and (b) and *Thomassie v. Savoie,* 581 So.2d at 1034, *writ denied,* 589 So.2d 493 (La.1991). *See also Traina v. Whitney National Bank,* 109 F.3d at 246 (5th Cir. 1997)("A creditor seeking to avoid a transfer now must prove that the offending transaction: (1) was made or effected after the right of the obligee arose and (2) caused or increased the obligor's insolvency.")

**235.** La. Civ.Code art. 2036, Comment (b).

finds that the plaintiffs have the burden of proving that B & W was insolvent at the time of the transfers based upon an objective estimate of B & W's future asbestos liabilities.

### E. *GAAP*

■ The defendants assert that generally accepted accounting and auditing principles (GAAP) provide the only objective standard for assessing the reasonableness of a debtor's estimate of contingent liabilities. The defendants further contend that "in solvency cases the courts consider GAAP to be 'presumptively' valid".[236] The plaintiffs argue that GAAP does not control in a solvency determination.

The case law supports the plaintiffs' position. Virtually all of the cases that discuss GAAP in the context of a solvency analysis recognize that the court is not bound by GAAP in making a solvency determination.[237] As stated in the frequently cited case of *In re Sierra Steel, Inc. v. Totten Tubes Inc.,*[238]

> The authorities cited by the debtor do not compel the conclusion that the bankruptcy court must follow GAAP in making solvency determinations. Requiring application of GAAP would make ac-

countants and the board which promulgate GAAP the arbiters of insolvency questions. Clearly the Code provides that judges should make such decisions. Furthermore, there is no policy reason why judges should not be allowed to consider subsequent events such as the actual collection rate for receivables, in valuing assets and determining liabilities. Thus although GAAP are relevant, they are not controlling in insolvency determinations.

The defendants cite the case of *In re Ohio Corrugating Co.,*[239] which recognized that GAAP principles do not control a court's decision on solvency analysis, but held that it was inclined to "assign presumptive validity to the treatment of assets and liabilities according to GAAP". The court reasoned that to do otherwise would unfairly penalize participants who reasonably relied on GAAP in assessing the solvency of the debtor prior to the buyout at issue. Similarly, the case of *In re Centennial Textiles, Inc.,*[240] which also recognized that GAAP principles do not control a court's decision, relied upon *Ohio Corrugating* in assigning "presumptive validity" to GAAP. The court finds that the reasoning of *Ohio Corrugating,* and *Cen-*

---

**236.** Pl. 292, Defendants' Post–Trial Memorandum at 18.

**237.** *See Arrow Electronics, Inc. v. Justus (In re Kaypro),* 230 B.R. 400, 412 (9th Cir. BAP 1999)("[T]here is no generally accepted accounting principle method for analyzing the insolvency of a company.... Although such principles are relevant, they are not controlling in insolvency determinations"); *In re Lease–A–Fleet, Inc.,* 155 B.R. 666, 679 (Bankr. E.D.Pa.1993)("Courts are not required to rely upon GAAP standards when determining the issue of insolvency."); *In re Joshua Slocum, Ltd.,* 103 B.R. 610, 623–24 (Bankr.E.D.Pa. 1989)("While GAAP principles do not control this court's determination of insolvency, we are inclined to accord weight to a company's treatment of its assets and liabilities accord-

ing to GAAP."); *In re Richmond Produce Co.,* 151 B.R. 1012, 1019 (Bankr.N.D.Cal.1993)("However, generally accepted accounting principles do not control the determination of solvency in a trustee's avoidance action").

**238.** 96 B.R. 275, 278 (9th Cir. BAP 1989) [footnote omitted]. *See also In re Labrum & Doak, LLP,* 227 B.R. 383, 388 (Bankr.E.D.Pa.1998)(Actions taken by accountants in an insolvency analysis which are contrary to GAAP principles should be eminently logical and supportable as an exception for good cause).

**239.** 91 B.R. 430, 438 (Bankr.N.D.Ohio 1988).

**240.** 220 B.R. 165, 175 (Bankr.S.D.N.Y.1998).

*tennial Textiles* is not applicable to the pending case because there was no reliance by the plaintiffs upon B & W's financial statements, and therefore no reason to find that GAAP principles are "presumptively valid".

The defendants also assert that the case of *In re Xonics Photochemical, Inc.*,[241] "the seminal federal decision on the valuation of contingent liabilities for purposes of federal fraudulent transfer solvency analysis, ... drew heavily on GAAP and FAS 5."[242] The court disagrees with this interpretation. *Xonics* does not provide authority that GAAP controls in insolvency disputes, but held that contingent liabilities must be discounted.[243] That contingent liabilities must be discounted is not disputed by the plaintiffs.[244]

The evidence in the case also supports the conclusion that the principles of GAAP are not controlling. As Dr. Peterson testified without contradiction or rebuttal, GAAP valuations are at most a starting point for arriving at the fair valuation of a company, and do not reflect the fair value of the assets of a company.[245] Dr. Dunbar's book does not mention GAAP as providing guidance for asbestos liability valuation, much less imply that GAAP is determinative.[246] Nor did Dr. Dunbar testify to that effect. Thus, merely because the accountants "blessed" B & W's forecast,[247] does not mean that B & W's forecast represents the actual amount of B & W's future asbestos liabilities.

The court concludes that although GAAP principles are relevant, they are neither controlling nor presumptively valid in this case in determining B & W's solvency.

*F.   Plaintiffs did not meet their burden of proving B & W's insolvency as of July 1, 1998*

■  The plaintiffs' experts estimated that B & W's future asbestos liability as of July 1, 1998 was:

Dr. Peterson:   preferred—$4.172 billion
                minimum—$2.0 billion,[248]

Dr. Florence:   $3.505 billion.[249]

The defendants did not prepare or introduce a special estimate made for trial purposes, but relied upon B & W's 1997 forecast that was in effect in B & W's financial statements of June 30, 1998, and which estimated B & W's future asbestos liabilities to be $866 million. The defendants introduced the expert testimony of Dr. Dunbar to the effect that the B & W estimate was reasonable.[250] Given the stipulations of the parties, the determination of whether B & W was insolvent or not depends upon the amount of B & W's future asbestos liabilities as of July 1, 1998. As discussed above, the court is persuaded

241.   841 F.2d 198, 199–200 (7th Cir.1988).

242.   Defendants' Post–Trial Memorandum at 18.

243.   841 F.2d at 200.

244.   *See* Pl. 260, Plaintiffs' Reply Trial Brief at 25. The plaintiffs do assert, however, that the debtors' future asbestos liability is not contingent.

245.   Tr. 10/24/01 at 65.

246.   Ex. 1603.

247.   The "blessing" by the E & Y actuaries was, if anything, only a partial blessing. The May 22, 1998 report stated: "We also continue to recommend that a more rigorous analysis of B & W's asbestos exposures be undertaken to assist in reducing the level of uncertainty associated with this significant liability." *See* Finding of Fact # 101.

248.   *See* Finding of Fact # 45.

249.   *See* Finding of Fact # 54.

250.   *See* Finding of Fact # 83.

by the plaintiffs' position that their burden of proving that B & W was insolvent at the time of the transfers is based upon an objective estimate of B & W's future asbestos liabilities.

The plaintiffs argue that the court must determine the actual amount of B & W's future asbestos liabilities. The jurisprudence on the Louisiana revocatory action does not contain a case similar to this one, and given the difficulties of determining future asbestos liabilities, the court is unable to determine the exact amount of B & W's future asbestos liabilities as of July 1, 1998.

The court is persuaded by the testimony of Dr. Dunbar, however, that the defendants' estimate was not unreasonable. The court is not convinced by the testimony of Drs. Peterson and Florence. The court may well be persuaded by their testimony on other estimation issues at other times for other purposes. On the present issue before the court, however, the plaintiffs have failed in their burden of proof. Considering the knowledge available to the defendants in 1998, and applying an objective standard, the court cannot find that B & W's estimate of future asbestos liability was so unreasonable that B & W was insolvent on July 1, 1998. By use of 20–20 hindsight,[251] the court could easily conclude that B & W's estimate was low, even considering the information that was available on July 1, 1998. But without the use of hindsight, the estimate does not appear so low or unreasonable for this court to conclude that B & W knew or should have known that it was insolvent on that date.

The methodologies for estimating future asbestos liabilities yield a wide range in results, as indicated by the divergence in testimony among the various fact and expert witnesses.[252] Given the numerous variables involved in estimating exposure, latency periods, product identification, etc., any estimation of asbestos liabilities is problematical, to say the least. Assumptions must be made that result in huge ranges of possible results. Predicting the future is always uncertain, and hindsight is perfect. Under the present circumstances in which the court is attempting to determine the amount of future asbestos liabilities for determining B & W's solvency as of July 1, 1998, the court cannot use hindsight and can only determine whether the predictions by B & W were reasonable under the circumstances existing at the time they were made. Applying that standard, the court concludes that B & W's estimates were reasonable and thus the plaintiffs have failed to carry their burden of proving that B & W was insolvent.

The court again emphasizes that valuations and estimations in bankruptcy are done for different reasons, as of different times, and may be used for different purposes.[253] If the court is required to do further estimates in this case, for any purpose other than determining whether B & W was insolvent in June 1998, the determi-

---

251. See, e.g., In re R.M.L., Inc., 92 F.3d 139, 155 (3rd Cir.1996)("The use of hindsight to evaluate a debtor's financial condition for purposes of the Code's 'insolvency' element has been criticized by courts and commentators alike".); In re DAK Industries, Inc., 195 B.R. 117, 125 (Bankr.C.D.Cal.1996)(Caution should be taken not to use hindsight to determine if business was on its "deathbed").

252. A good example of the divergence, even among the plaintiffs' witnesses, is the testimony of Dr. Florence that any estimation below $8.4 billion (before discounting) was, in his opinion, unreasonable, (Tr. 10/24/01 at 31), as compared to Dr. Peterson's testimony that his preferred undiscounted estimate was $11.6 billion, but that his minimum estimate was $6.6 billion. See Finding of Fact # 44.

253. See supra at 44 n. 202.

nation in this opinion and judgment will not be binding.

Judgment will be entered accordingly.

### *JUDGMENT*

For the reasons assigned in the foregoing memorandum opinion issued this date,

**IT IS ORDERED, ADJUDGED, AND DECREED** that the Babcock and Wilcox Company, was solvent under the Louisiana revocatory action on July 1, 1998.