**In re W.R. GRACE & CO., et al., Debtors.**

**Official Committee of Asbestos Personal Injury Claimants and Official Committee of Asbestos Property Damage Claimants of W.R. Grace & Co., suing in behalf of the Chapter 11 Bankruptcy Estate of W.R. Grace & Co., et al., Plaintiffs,**

v.

**Sealed Air Corporation and Cryovac, Inc., Defendants.**

**Official Committee of Asbestos Personal Injury Claimants and Official Committee of Asbestos Property Damage Claimants of W.R. Grace & Co., suing in behalf of the Chapter 11 Bankruptcy Estate of W.R. Grace & Co., et al., Plaintiffs,**

v.

**Fresenius Medical Care Holdings, Inc. and National Medical Care, Inc., Defendants.**

**Bankruptcy Nos. 01–1139 to 01-1200. Adversary Nos. 02–2210, 02–2211.**

United States Bankruptcy Court, D. Delaware.

July 29, 2002.

David W. Carickhoff, Jr., Laura Davis Jones, Rachel Sarah Lowy, Rosalie L. Spelman, Pachulski, Stang, Ziehl, Young & Jones, Michael R. Lastowski, Duane Morris LLP, Wilmington, DE, Peter James Duhig, Venable, Baetjer and Howard, LLP, Baltimore, MD, for W.R. Grace & Co.

Rick S. Miller, Theodore J. Tacconelli, Ferry & Joseph P.A., Mark T. Hurford, Matthew G. Zaleski, III, Campbell & Levine, LLC, Wilmington, DE, for Official Committee of Asbestos Property Damage Claimants and Official Committee of Asbestos Personal Injury Claimants.

David R. Hurst, Kevin F. Brady, Mark S. Chehi, Patricia A. Widdoss, Skadden, Arps, Slate, Meagher & Flom, William H.

Sudell, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Sealed Air Corp., Cryovac, Inc., Fresenius Medical Care Holdings, Inc., and National Medical Care, Inc.

Michael R. Lastowski, Richard W. Wiley, Duane Morris LLP, Wilmington, DE, for Official Committee of Unsecured Creditors.

Francis J. Murphy, Murphy, Spadaro & Landon, Wilmington, DE, trustee.

Frank J. Perch, III, Office of U.S. Trustee, Wilmington, DE, U.S. Trustee.

## OPINION

WOLIN, District Judge.

This matter has been opened before the Court upon the parties' application for an *in limine* ruling on the choice of law and the legal standards to be applied at trial to determine the solvency of the debtor, defendant W.R. Grace & Co. in this fraudulent conveyance adversary proceeding.[1] The Court has reviewed the submissions and heard the oral arguments of counsel. For the reasons set forth below, the Court will grant an *in limine* ruling and hold that there is no conflict between the laws of the various jurisdictions proposed and the Court will apply the Uniform Fraudulent Transfer Act ("UFTA") to the proceedings. The Court will further grant an *in limine* ruling and hold that, subject to certain conditions and findings identified in this Opinion, an asbestos claim filed after the transfer date may be considered in determining the debtor's solvency in this case under section 5 of the UFTA.

## BACKGROUND

These adversary proceedings involve allegations of fraudulent conveyance, includ-

---

1. The Court recognizes that this sentence does some violence to the complex procedural path by which the issue has reached the

Court. The Court is satisfied that this characterization of the application before the Court captures its essence and prejudices no party.

ing the conveyance of a former division of the debtor W.R. Grace–Conn to the entity now known as Sealed Air Corporation in March 1998. The Court, in an attempt to speed the resolution of these adversary proceedings, has ordered that the trial scheduled for September 30, 2002, shall deal with a limited set of issues. First, the September 30 trial shall deal only with the Sealed Air transaction. Second, the Court has ordered that only the allegations of constructive fraudulent conveyance shall be tried at that time, Order of March 28, 2002, thus making irrelevant for the time being issues of the parties' intent regarding the transfer. Order of April 17, 2002.

The complaint invokes the authority of 11 U.S.C. § 544(b) which permits an action to avoid a transfer of an interest that would be avoidable under applicable law by a creditor. Plaintiffs do not base their claim upon the fraudulent transfer section of the bankruptcy code, 11 U.S.C. § 548. Instead, the complaint stakes its claim on other "applicable law," including without limitation the UFTA, which is in force in the majority of the states. It will be relevant to the discussion to follow to note, therefore, that the claims at bar are state-law causes of action authorized and incorporated into the bankruptcy proceeding by Title 11.

## 1. Choice of Law

■ The parties have spent little of their energies arguing the correct choice of law. Plaintiffs argue that New Jersey law controls; defendant Sealed Air argues that Delaware law should govern. However, no party has advanced any material difference between the law of the potential fora. Both have enacted versions of the UFTA that are identical in relevant part.

Applying basic choice of law principles, plaintiff makes the stronger case that New Jersey law should be applied were there any true conflict. That is the state where Sealed Air is located. W.R. Grace has its offices in Florida, but no party has urged that Florida law should apply. The Court notes that Florida too has enacted the UFTA. Delaware's only contact with this matter is that it is the state of incorporation of the transferee and the subsidiary that is the subject of this fraudulent transfer action. The state of incorporation may be an important contact where the issue is internal corporate governance, but that is not the situation here.

Therefore, for the record, the Court finds that New Jersey law is most properly applied to this matter. Because there is no true conflict of laws, the Court will rely on the UFTA and treat as persuasive authorities from each of the UFTA jurisdictions.

## 2. The UFTA

### a. The Statutory Language

At the outset, there appears to be some confusion in the arguments of counsel regarding which section or sections of the UFTA are at play here in light of the Court's limitation of the issue to constructive fraudulent conveyance. Section 4(a)(1) states that a transfer is fraudulent "if the debtor made the transfer or incurred the obligation ... with actual intent to hinder, delay or defraud any creditor of the debtor." This is obviously the definition of actual fraud, not constructive fraud, and to avoid premature expenditure of resources on this branch of the case the Court barred discovery into the parties' intent.

There are two sections of the UFTA that arguably may be considered "constructive fraudulent transfer" provisions, section 4(a)(2) and section 5(a). Each involves a two-element test. The first element is common to both; the debtor did

not receive reasonably equivalent value in the accused transaction. The second element deals generally with the debtor's insolvency, but varies between the two sections. Section 4(a)(2) provides that a transfer is fraudulent if the debtor does not "receiv[e] a reasonably equivalent value" and the debtor

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that he [or she] would incur, debts beyond his [or her] ability to pay as they became due.

In section 5, in contrast, the second, insolvency element is stated more simply. A transfer is fraudulent under section 5 if reasonably equivalent value is lacking "and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." Insolvency is defined elsewhere by reference to a strict balance sheet test; a debtor is insolvent if its debts exceed its assets. UFTA § 2.

Plaintiffs believe that the Court's limitation of the September 30 trial to "constructive fraudulent conveyance" means that only section 5 is at issue now. Defendants, by relying on the wording of section 4 in arguing their position on standards, impliedly take the position that both section 4(a)(2) and section 5 fall within the generic term "constructive fraudulent conveyance." As an abstract proposition, the Court agrees. Sections 4(a) and 5 have important differences both in scope and effect and these differences are important to this Opinion. However, both protect creditors from transfers that diminish the value of the debtor's remaining estate, regardless of any truly fraudulent intent. "Constructive" fraudulent conveyance comfortably covers this concept under either section.

But plaintiffs have focused their argument on the definition of insolvency in section 5. For reasons that will appear *infra*, the Court believes that the section 5 definition is the broader of the two. Moreover, if plaintiffs choose to aim solely at section 5 alone, that is the section on which defendants must defend. Therefore, the Court will focus on the standard of insolvency under section 5 in this Opinion, addressing section 4(a)(2) primarily by way of contrast to the broader section.

The essential dispute is this. Defendants contend that the liabilities that should be considered to determine the debtor's solvency on the transaction date are those that were known on that date or those that the debtor reasonably should have known about at that time. Plaintiffs argue that section 5 insolvency is determined by the actual liabilities of the debtor, net of assets. What the debtor may have known about those liabilities on the transfer date, reasonably or otherwise, is not at issue, plaintiffs contend.

The importance of this issue stems from the mass toxic tort nature of the debtor's primary liability. Obviously, by 1998, the harmful nature of asbestos in general and W.R. Grace's asbestos liability in particular were nationally known and had been so for decades. Under defendants theory, W.R. Grace's liabilities in 1998 would include then-existing asbestos claims and a reasonable estimate of claims in the future. Reasonableness, it is argued, would turn on the legitimacy of the method by which the 1998 claiming rate was extrapolated to the future.

Setting aside for the moment the question of extrapolation and its reasonableness, defendants have represented repeatedly that W.R. Grace experienced a substantial increase in asbestos claims af-

ter 1998, and that it was this spike in claims that eventually drove the company into bankruptcy. Whether the alleged increase can realistically be characterized as a "spike" need not be accepted as proven truth at this point. According to plaintiffs' figures, the debtor averaged about 31,500 claims per year from 1995 through 1998. In 2000, W.R. Grace received about 48,700 claims, an increase but not one of exponential proportions. It is true that, from 1996 to 1999, claims appear to have steadily declined. However, plaintiffs represent that at least some of that decline is attributable to stand-still agreements, "moritoria," in place from 1997 to 1999 with the leading firms representing claimants. According to plaintiffs, the moritoria prevented the filing of new claims until they began to expire in 2000. This, plaintiffs contend, explains the perceived increase in claims in that year.

The significance of these allegations will be explored later in this Opinion. It suffices now to note that many of the asbestos claims presently pending against W.R. Grace were not formally asserted against the company until after the allegedly fraudulent transfer in 1998. Determining the standard for proving insolvency under section 5 will determine to what extent the post–1998 claims should be considered in calculating W.R. Grace's solvency on the transaction date. The difference in result, depending on which theory is adopted, may be dramatic.

Looking first at the letter of the statute, it is apparent that defendants' position fits neatly with the terms of section 4(a)(2)(ii). If the question is whether the debtor "reasonably should have believed that he [or she] would incur, debts beyond his [or her] ability to pay as they became due," UFTA § 4(a)(2)(ii), then the reasonableness of W.R. Grace's March 1998 estimation of future asbestos claims would be central to

the solvency calculation. Likewise the analysis of whether the debtor was undercapitalized following the transfer turns on reasonableness, although no party has raised the undercapitalization prong of section 4(a)(2)(i).

■ Section 5 makes no mention of the debtors knowledge or reasonableness of estimation in relation to its own insolvency. As framed by the statute, the only question is whether the debtor was insolvent on the transfer date or became insolvent. To the extent defendants would have the Court read reasonable estimation of liabilities into section 5, such an argument would be contrary to one of the most fundamental and universally accepted notions of statutory construction. Section 4 explicitly invokes reasonableness. Section 5 does not. If one limits one's consideration to the literal terms of the statute, the omission of reasonableness from the solvency prong of section 5 must be given effect. The clear implication of the text of the two sections is that solvency under section 5 is to be based upon the objective reality of whether "the debtor was insolvent at that time" and not by reference to what the debtor may have reasonably estimated its liabilities to be.

The question then becomes whether the case law, by way of interpretation, judicial gloss, or policy, would lead to a different result. Relevant case law applying the UFTA context is not plentiful and particularly not in the mass tort context. Therefore, the Court must be guided also by cases interpreting other, similarly worded statutes. The insolvency element of the Bankruptcy Code's constructive fraudulent conveyance section, 11 U.S.C. § 548(a)(1)(B)(ii)(I), is very close to the parallel provision in section 5 of the UFTA. *See In re Grandote Country Club Co.*, 252 F.3d 1146, 1152 (10th Cir.2001). Definitional sections, importantly the defi-

nitions of "insolvency," "debt" and "claim" are also the same. Making due allowance for differences of purpose and context, the Court will be guided by whatever case law exists interpreting these statutes.

### b. The Probability Discount Rule

Defendants rely on a line of cases dealing with contingent liabilities (and assets), many of which contain language that, facially, supports defendants' position. Chief among these cases is *R.M.L., Inc.*, 92 F.3d 139 (3d Cir.1996), in which Judge Cowen wrote:

a court looks at the circumstances as they appeared to the debtor and determines whether the debtor's belief that a future event would occur was reasonable. The less reasonable a debtor's belief, the more a court is justified in reducing the assets (or raising liabilities) to reflect the debtor's true financial condition at the time of the alleged transfers.

*Id.* at 156. In *R.M.L.*, the debtor claimed it was solvent on the transfer date because it had a commitment for a loan that would have saved the company had the funds actually become available. Following the transfer, the loan failed to close and the debtor filed for bankruptcy.

The issue was whether the payment of fees for the loan commitment by the debtor was a fraudulent transfer under the Bankruptcy Code. The lower court, as affirmed by the Court of Appeals, found that the proper measure for valuing contingent assets (or liabilities) was to discount them to present value as of the transfer date by the probability that the contingency will not come to pass and that the asset (or liability) will not be realized.

*R.M.L.* drew on *In re Xonics Photochemical, Inc.*, 841 F.2d 198 (7th Cir.1988). While *Xonics* is in fact a case about standing, Judge Posner discussed the question of valuing contingent liabilities for insolvency purposes. The debtor-in-possession argued that when it guaranteed the debt of a corporate affiliate the entire amount of that debt became countable as a liability, although the affiliate did not default on the debt until some time after the accused transaction.

Judge Posner wrote:

The proposition is absurd; it would mean that every individual or firm that had contingent liabilities greater than his or its net assets was insolvent—something no one believes. Every firm that is being sued or that may be sued, every individual who has signed an accommodation note, every bank that has issued a letter of credit, has a contingent liability.

*Id.* at 199.

Judge Easterbrook seconded this proposition in *Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d 657, 660 (7th Cir.1992), writing that "[d]iscounting a contingent liability by the probability of occurrence is good economics and therefore good law, for solvency, the key to § 548(a)(2), is an economic term." It is plain from *R.M.L.* and other cases cited by defendants that the appropriate discount factor is derived from the reasonable foreseeability (as of the transfer date) of the contingency coming to pass.

Defendants read *R.M.L.* differently and point out that the Court of Appeals affirmed the finding below that the loan upon which debtor had placed its hopes had little or no chance of closing as of the transaction date. From this defendants argue that *R.M.L.* stands for the proposition that a finding of insolvency under the UFTA rests on the reasonableness of the debtor's estimation of its own solvency, both with respect to contingent future

events *and* then existing financial circumstances.

This is simply not correct. What the lower court held was that, on the transaction date, the debtor was unable to meet certain conditions of closing the loan and, therefore, that the credits carried on its books which depended upon the loan should be ignored. The Third Circuit held that "The bankruptcy court correctly determined that a debtor's creative accounting practices, which have the effect of grossly overstating its financial condition, cannot be the basis of a court's solvency analysis." One may search in vain for any statement that, had the debtor's perception of its solvency on the transaction date been wrong but reasonable, it should have been found to be solvent. On the contrary, the clear thrust of the opinion is that the debtor was insolvent on the transaction date regardless of what it may have thought, reasonably or otherwise.[2]

Only after this finding, did the *R.M.L.* court go on to treat the loan closing as a supposed contingent event. It is not clear that the court needed to do so. However, as noted, the court applied the probability discount rule to the loan closing, and affirmed the essence of the lower court's ruling that because of the prior insolvency of the debtor the probability was zero.

While this Court believes that the contingent event analysis of *R.M.L.* is, at best, a holding in the alternative, it is the branch of the opinion that is most frequently cited, including by defendants here. It is from this branch that the language regarding reasonableness and foreseeability comes. The Court of Appeals said that "a court looks at the circumstances as they appeared to the debtor and determines whether the debtor's belief that a *future* event would occur was reasonable." 92 F.3d at 156 (emphasis added). The panel plainly was not talking about already existing facts and whether the debtor's understanding of them with respect to its solvency was reasonable.

### c. The Post–1998 Claims and "Claims" Under the UFTA

▋ For the probability discount rule to apply in this case, however, the Court must find that the post–1998 asbestos claims against W.R. Grace represented a contingent future liability on the date of the transfer. Stating the question more broadly, the Court must first determine whether, and only then how, the post–1998 claims are to be counted as "debts" in the solvency analysis.

The statute defines a debt as a "liability on a claim." UFTA § 1(5). A claim is treated very broadly, as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." UFTA § 1(3). Thus the initial question is whether the post–1998 claimants possessed a "right to payment," *i.e.* a "claim" for UFTA solvency purposes, on the transaction date even though they did not assert their claims until later. If so, only then must the Court consider the implication of the defendants' argument that any such claim was contingent as of March 1998.

---

**2.** To be fair to defendants, it is true that Judge Cowen stated that the debtor "knew or should have known" of its insolvency on the transaction date. 92 F.3d at 155. Defendants have not emphasized this passage. In light of the other language in the opinion and the holding of the court below that focused on the actual rather than the foreseeable collapse of the debtor, the Court does not believe that this brief reference should be read to establish a rule of foreseeability with respect to a debtor's then-existing financial condition.

*In re M. Frenville Co.*, 744 F.2d 332 (3d Cir.), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985), is the controlling case for what may be considered a claim under the identical language in the Bankruptcy Code, 11 U.S.C. § 101(5) (codified at 101(4) when *Frenville* was decided). *Frenville* concerned whether an indemnification action was subject to the automatic stay. The underlying acts of the alleged tortfeasors (negligent preparation of financial statements) occurred prepetition, but neither the underlying suit nor the tortfeasors' indemnification action against their bankrupt employer was filed until after the bankruptcy case had commenced.

The Court of Appeals noted legislative history indicating Congressional intent to define "claim" broadly.

> "The definition is any right to payment, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured.... By this broadest possible definition and by the use of the term throughout the title 11 ... *the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent,* will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court."

*Frenville*, 744 F.2d at 336 (quoting H.R.Rep. No. 595, 95th Cong., 2d Sess. 309, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6266) (emphasis added; first omission in original).

Despite this statement, *Frenville* found that "claim" could not be read so broadly as to vitiate section 101(5)'s threshold requirement that there be a "right to payment." The court noted, moreover, that the statutory definition actually begs the question, defining "claim" as a "right to payment" but not stating when such a right arises. By reference to first principles of bankruptcy law, the *Frenville* court concluded that, in the absence of a federal pronouncement on this point, state law must control when a "right to payment" arises. *Id.* at 337 ("[W]hile federal law controls which claims are cognizable under the Code, the threshold question of when a right to payment arises, absent overriding federal law, 'is to be determined by reference to state law.'" (quoting *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161, 67 S.Ct. 237, 91 L.Ed. 162 (1946))).

New York law controlled the dispute in *Frenville* and provided that the indemnification claim did not accrue until the original plaintiff brought suit against the tortfeasor-indemnitees. Thus, the right to payment arose post-petition and the claim was not barred by the automatic stay nor discharged in the bankruptcy. *Frenville* has proved a remarkably unpopular decision and no other Circuit Court of Appeals has followed it. It is widely read to posit an accrual test for bankruptcy claims, as distinguished from a conduct test under which only the conduct giving rise to liability must have occurred to give rise to a claim under the Code. *See Beeter v. Tri-City Prop. Mgmt. Servs., Inc.*, 173 B.R. 108, 118 (Bankr.W.D.Tex.1994).

*Frenville* remains the law of this Circuit, however, as affirmed in *Jones v. Chemetron Corp.*, 212 F.3d 199, 206 (3d Cir.2000). This Court believes, moreover, that *Frenville's* basic rule applies with particular force in this proceeding. It will be remembered that *Frenville* concerned the application of the federal Bankruptcy Code and the interplay between the definition of a claim and such core bankruptcy issues as the effect of the automatic stay and discharge of the debtor. This case, however, is governed by the UFTA as enacted by

the State of New Jersey. No uniquely bankruptcy policies are at play here; the only question is whether the debtor was insolvent within the meaning of this state fraudulent conveyance statute.

There is little case law applying the rationale of *Frenville* in the mass tort context. In the *Chemetron* case, the Court of Appeals applied Ohio law to determine whether personal injury claims based on radioactive and other contamination were discharged by the confirmation of the polluter's chapter 11 plan. 212 F.3d 199. The panel found that Ohio applied a discovery rule for accrual of personal injury claims for statute of limitations purposes. *Id.* at 206. Because discovery occurred or reasonably should have occurred pre-petition, the claims were barred.

*Chemetron* dealt with whether the claimants should have been charged with knowledge of their claim such that the claims bar date set by the bankruptcy court would bar their claims. Application of a state-law discovery rule borrowed from the state statute of limitations jurisprudence makes perfect sense in that context. This Court, however, does not believe that looking to accrual for state statute of limitations purposes makes sense when determining the existence of a "right to payment" for solvency purposes under the fraudulent conveyance statute.

The Court of Appeals assumed as much, without deciding the point, in *Schweitzer v. Consolidated R. Co.,* 758 F.2d 936, 942 (3d Cir.), *cert. denied,* 474 U.S. 864, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985).

We assume, without deciding, that under certain circumstances a cause of action may withstand a motion to dismiss for failure to state a claim though the action has not "accrued" within the meaning of the relevant statute of limitations and, thus, a cause of action may "exist" before it has "accrued."

Nor does *Frenville* require a contrary conclusion. The issue is whether, under state law, each of the elements is in place that give rise to a right against the debtor in favor of the claimant. "The plain meaning of a 'right to payment' is nothing more nor less than an enforceable obligation. . . ." *In re Mattera,* 203 B.R. 565, 570 (Bankr.D.N.J.1997) (citing *Frenville, inter alia*). That a claimant may have discovered this right and triggered the limitations period within which it must be asserted does not affect the question posed in *Frenville:* when did state law give rise to a right to payment?

The Third Circuit's *Schweitzer* opinion, 758 F.2d 936, discussed when a right to payment arises for personal injury due to asbestos exposure, although the value of that opinion is lessened by the fact that the existence of tort liability was controlled by federal law under the Federal Employers' Liability Act (FELA). However, citing general principles of tort law, the *Schweitzer* panel found that exposure to asbestos was not enough, and that no tort liability arose until the claimant "suffered identifiable, compensable injury." *Id.* at 942.[3]

It is far from clear that all states actually subscribe to the manifestation rule applied under FELA by the *Schweitzer* court. New Jersey, for example, recognizes a cause of action for medical monitoring based upon simple exposure to toxic materials, *see Ayers v. Jackson Township,* 106 N.J. 557, 525 A.2d 287 (1987), at least under specially defined conditions. *See*

---

3. *Schweitzer,* like several of the cases already cited, was concerned with the date the personal injury claims arose to determine whether those claims were discharged in the bankruptcy.

*Theer v. Philip Carey Co.,* 133 N.J. 610, 628 A.2d 724 (1993). Moreover, the amount of compensable physical harm needed to give rise to a claim will clearly vary from state to state. For example, pleural thickening alone without a showing of functional impairment is sufficient in New Jersey to open up the full panoply of tort remedies for asbestos exposure. *See Mauro v. Raymark Indus., Inc.,* 116 N.J. 126, 561 A.2d 257 (1989). *Schweitzer's* rejection of "subclinical injury" as sufficient to establish a FELA claim can not directly control in the face of contrary state-law authority, given the rule of *Frenville.*

To continue in rendering this *in limine* opinion, the Court must engage in some reasonable assumptions ahead of the proven facts. It is reasonable to conclude that of the tens of thousands of persons making claims for asbestos personal injury against W.R. Grace after the 1998 transfer date, substantial numbers of them had viable claims against the company prior to that time. Asbestos had not been manufactured or employed in industry for many years prior to 1998 and any person with a post–1998 claim must have been exposed long before the transfer date. That such exposure would lead to long-term, serious, health effects with long latency periods has been common knowledge for twenty to perhaps thirty years.

It may be, under some states' law, that this exposure is enough. *See, e.g., Ayers,* 106 N.J. 557, 525 A.2d 287. However, it must also follow that many, and no doubt a substantial majority, of these persons had some physical manifestation of their exposure, whether they knew it at that time or not. Exposure and physical manifestation doubtless gave the affected person a claim under the laws of most states. *See Schweitzer,* 758 F.2d at 942 (quoting W. Prosser & P. Keeton, *Prosser & Keeton on Torts* 165 (5th ed.1984)).

■ Therefore, and for the reasons stated thus far, these persons had a "right to payment" and thus a claim for purposes of the solvency analysis of the UFTA on the transfer date. To recognize this does not contradict the rule defendants reiterate that solvency must be determined as of the transaction date. *Mellon Bank v. Metro Communications,* 945 F.2d 635, 648 (3d Cir.1991). It cannot matter that the claimants themselves may have been unaware of their own claim in 1998. The assumption of *Schweitzer,* 758 F.2d at 942, quoted *supra* at 861, is intuitively correct—a cause of action may exist before its owner is aware of it. *Id.* ("a cause of action may 'exist' before it has 'accrued' [under the discovery rule of the statute of limitations]"). The UFTA states that a claim is a claim "whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." This expansive language must negate any residual inference that a right to payment must be known and asserted to be a claim.

■ The Court cannot accept defendants' contention that the post–1998 claims were contingent and thus subject to discounting by the reasonable probability that the contingency would not arise. Third Circuit has defined a contingent claim as one "which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event." *Frenville,* 744 F.2d at 336 n. 7. The easy example is the surety case, *see, e.g., Xonics,* in which the obligation is complete, but it is triggered by the default of the third-party guarantee. *R.M.L.* is another; the company collapsed upon the refusal of a bank to close a loan transaction, making certain previously booked credits worthless.

An illustrative counter-example appears in *Grady v. A.H. Robins Co.,* 839 F.2d 198

(4th Cir.), *cert. dismissed,* 487 U.S. 1260, 109 S.Ct. 201, 101 L.Ed.2d 972 (1988), a leading case of those declining to follow *Frenville.* In *Grady,* the panel held that exposure alone gave rise to a claim under the Bankruptcy Code, even though manifestation of injury and thus a state cause of action did not yet exist. The claim was a contingent one, however, and that contingency was the manifestation of a compensable injury. *Id.* at 203. Of course, in this case the Court makes its *in limine* ruling on the assumption either that manifestation had already occurred with respect to the post–1998 claimants or that the relevant state's law does not require manifestation in latent toxic tort cases.

It is difficult to discern what extrinsic event was left to occur as of 1998, to make W.R. Grace liable for asbestos injuries to the post–1998 claimants. *Ex hypothesi,* these persons were already exposed to and injured by W.R. Grace's products. To say that the act of making the claim was the extrinsic event stretches the meaning of that phrase too far; the formal claim is not extrinsic to the underlying liability, nor is it an event creating liability where none existed before. To hold that the making of a formal claim was the contingency upon which W.R. Grace's insolvency was balanced is to hold, in effect, that unknown claims are always contingent.

For the reasons already set forth, the Court rejects the proposition that unknown claims are necessarily contingent. What scant case law that exists is in accord. *S.E.C. v. Antar,* 120 F.Supp.2d 431 (D.N.J.2000), applied a 2000 judgment for securities fraud of $15 million to determine the debtor's solvency under the UFTA with respect to 1991 and 1997 transactions. The court found that "it is now clear that the SEC's unliquidated claim against [the debtor] was, and is, approximately $15 million . . . ." *Id.* at 443. The court did not treat the amount of the judgment, some three and nine years in the future with respect to the accused transactions, as a contingent event.

Nor did the *Antar* court hesitate over whether the claim was then known by the debtor. On the contrary, "[b]ecause the SEC's claim was based on [the debtor's] securities fraud in the 1980s, [the debtor] possessed this debt at the time of all of the 1991 and 1997 transactions." *Id.* Defendants object that related case law shows that the debtors were aware of the SEC's securities fraud claim prior to the transactions. Sealed Air 6/28/02 Brf. at 9 (citing *United States v. Antar,* 53 F.3d 568, 571 (3d Cir.1995)). But these debtors were not aware of the actual amount for which that claim would finally be liquidated.[4] Yet the *Antar* court applied this sum, without discount for probabilities or foreseeability, to the debtor's bottom line on the transfer date. Indeed, defendants' argument only emphasizes the parallels between *Antar* and this case. Like the debtor in *Antar,* in 1998 W.R. Grace knew it had an existing liability, it just did not know how big that liability was.

*In re Howdeshell of Ft. Myers,* 55 B.R. 470 (Bankr.M.D.Fla.1985), cast the contingent vs. unknown dichotomy as an issue of the occurrence or not of an intervening event. There accounting errors and a failure to allow for project completion costs showed the debtor to have been solvent when a challenged payment was made. In

---

4. Actually, it is far from clear from the cited page that there was a claim against the defendants in the fraudulent conveyance action. More informative cites from the Antar family case book are 15 F.Supp.2d 477, 481 (D.N.J. 1998) which determined liability for the claims and the principle opinion in the text, 120 F.Supp.2d at 434, which discloses that the amount of the SEC's civil claim was not finally set until 2000.

fact, the debtor was not solvent. The court rejected the debtor's argument that it could not consider the debtor's true financial picture on the date of the transaction. With respect to the completion costs, the court wrote: "If the increase in costs was not due to unexpected intervening events, it is really not an unanticipated increase, but merely an inaccurate estimate of the true cost as it, in fact, existed at the relevant time." *Id.* at 473.

At oral argument, the debtor's counsel posited a number of other supposed contingencies upon which, it was argued, claims depend before they become non-contingent, existing claims. These include the gamut of claimant behavior variables, such as delaying a claim past the statute of limitation, claiming against a more solvent target, and simply failing to sustain the burden of proof. Counsel maintained that these complexities mandate the conclusion that any post–1998 claim was contingent on the transfer date.

But just because claims are defeasible through later acts or omissions of the claimants does not mean they were never claims in the sense of being a "right to payment." Moreover, no-one suggests that each claim, be it prepost–1998, must be counted at face value without further analysis. As counsel are well aware, large numbers of asbestos tort claims are routinely analyzed and their value estimated by experts on the basis of epidemiology and statistics. The behavioral variables raised by counsel are typically taken into account in this process. That the Court must place a value on the post–1998 claims does not mean that they are not claims nor does it mean that they were merely contingent claims on the transfer date.

Defendants cite language from a number of cases which roundly condemn the use of hindsight in insolvency calculations and endorse reasonable foreseeability of liability as the proper measure. A moments study

in light of the principles already discussed reveal that the authorities are not on point and the cited passages have been taken out of context. For example, *In re Morse Tool, Inc.*, 148 B.R. 97, 132 (Bankr.D.Mass. 1992), says "the decision must be made on the basis of information and considerations available at the time of the buyout, not of hindsight." However, the court in *Morse* was addressing an allegation that the post-transfer debtor was left with unreasonably small capitalization. This issue appears in section 4 of the UFTA, a section which is shot through with questions of reasonableness, and not in section 5 focused on by plaintiffs here. The Court has already contrasted section 4 with section 5 of the UFTA on this basis. *See also In re WCC Holding Corp.*, 171 B.R. 972, 986 (Bankr. N.D.Tex.1994) (contrasting unreasonably small assets with insolvency).

Others of defendants' cases address the discrete issue of whether the debtor was a going concern or whether its assets should be counted at liquidation value on the transfer date. In *Moody v. Security Pac. Business Credit, Inc.*, 971 F.2d 1056 (3d Cir.1992), the Court of Appeals applied the established rule that assets are to be valued on a going concern basis unless financial collapse was "clearly imminent" on the transfer date. 971 F.2d at 1067. *In re Trans World Airlines, Inc.*, 134 F.3d 188 (3d Cir.), *cert. denied,* 523 U.S. 1138, 118 S.Ct. 1843, 140 L.Ed.2d 1093 (1998), followed Moody. There the Third Circuit valued public debt at its face value rather than at the market discount caused by anticipation of the debtor's demise, and declined to treat dissolution costs as a contingent event subject to the probability discount rule. *Id.* TWA's bankruptcy was not "clearly imminent," *id.* at 193, and therefore the going concern methodology drove the valuation.

The going concern valuation question is a far more specialized inquiry than the one

that is presented here. In *Moody* and *TWA,* the courts were concerned with a methodology for valuing specific assets and liabilities. Moreover, neither case suggest that "clearly imminent" collapse is to be determined from the perspective of the debtor's reasonable estimation. Rather, the logic of those opinions indicates that it is the courts' post-transfer assessment that will determine whether assets and liabilities are to be valued on a going concern basis or not. In any event, the discussion in these cases is clearly far removed from the issue of whether existing mass-tort liability should be counted against a debtor's estate for insolvency purposes.

The balance of defendants' cases concern truly contingent liabilities. In *R.M.L.,* 92 F.3d 139, a loan failed to close. *Xonics,* 841 F.2d 198, and *Covey,* 960 F.2d 657, involved guarantees by debtors that were triggered by a later default. Judge Easterbrook applied this line of authority in the field of toxic torts, in the following hypothetical

> To disregard the probability that the firm will not be called on to pay is to regard all firms as insolvent all of the time, for all firms face some (remote) contingencies exceeding the value of their assets. A firm's product might prove dangerous, maiming hundreds of customers; all of an air carrier's planes might fall out of the sky, or one of an electric utility's nuclear stations melt down, creating stupendous liabilities; all of an insurer's policyholders might die in the same year, generating obligations that exceed its assets. The probability of such occurrences is low, however, and it therefore makes sense to treat the firms as solvent.

*Id.* at 659.

This passage proves the rule in this case. W.R. Grace's product had *already* proven dangerous on the transfer date affecting tens of thousands, not hundreds. The post–1998 increase in the claiming rate was not an airplane falling out of the sky nor a melt down in a reactor. Every element of liability was already present and had been for many years. Nor is this akin to all of an insurer's policyholders dying in one year. W.R. Grace's asbestos claimants, pre- and post-transfer, are not all dead, thankfully. But the Court has taken as a working assumption that many, and perhaps all, of the post–1998 claimants had suffered a legally cognizable injury as of the transfer date.

Defendants' argument only works if one accepts their premise that the post–1998 asbestos claimants represented a contingent liability on the transfer date. The Court rejects this. The liability may have been unknown and the best estimates may have erred in projecting who would come forward with a claim of asbestos injury. This does not mean that liability for such claims was contingent.

Much of the opinion in *Babcock & Wilcox Co.,* 274 B.R. 230 (Bankr.E.D.La.2002) accords with the reasoning of this Court. The *Babcock* opinion too dealt with whether future asbestos claims should be considered in determining the debtor's solvency in a fraudulent conveyance proceeding. Defendants contended that none of the post-transfer claims should be counted, a position more extreme than defendants here. The court rejected this, finding under Louisiana law that "the moment an actionable wrong is done to one person through the fault of another, there arises automatically an obligation on the part of the wrongdoer to repair the damage." *Id.* at 259.

Thus, as this Court has already done, the *Babcock* court found that unasserted

asbestos claims were chargeable against the debtor's estate as of the date of the accused transfer. The *Babcock* court also endorsed more broadly the proposition that the courts should consider subsequent events to determine whether a debtor was solvent on a previous transfer date. *Id.* at 260 (quoting *In re Sierra Steel,* 96 B.R. 275, 278 (9th Cir. BAP 1989)).

However, without extended discussion, the *Babcock* court found that the post-transfer asbestos claims were contingent and applied the rule of *Xonics* that contingent claims must be discounted to value as of the transfer date by the reasonable probability of the contingency at that time. *Babcock* does not say upon what event the post-transfer asbestos liability was contingent—the language from the opinion quoted above suggests that the court viewed post-transfer claims as complete obligations for the purposes of the solvency analysis. The court noted the plaintiffs' argument that the claims were not in fact contingent, 274 B.R. at 260 n. 244, but did not address it.

The *Babcock* court ultimately found for defendants on the ground that plaintiffs had failed to sustain their burden that the debtors' estimation of the post-transfer claiming rate was unreasonable at the time of the transfer. However, it is difficult to satisfactorily explain why the *Babcock* court found that the post-transfer claims were contingent in the first place. While agreeing with the *Babcock* court on much of its primary analysis, this Court, for the reasons expressed already, respectfully must disagree with its secondary finding that the asbestos personal injury claims were contingent on the transfer date and therefore that the debtor's estimation of this supposedly contingent liability was subject only to review for reasonableness.

### 3. The Policy Arguments

Defendants deprecate the approach adopted by the Court, claiming that the claiming rate for asbestos claimants will always fluctuate and that the real liability of the debtor will never be known until approximately 2050 when all asbestos claimants are expected to cease. There are two answers to this point. First, is that the issue must be decided now because it is now that the plaintiffs seek to reach the transferred asset. In any event, to hold that the Court is not bound by the debtor's own reasonable estimation of its solvency does not mean that no-one can make such an estimation. The Court will undertake this burden to the best of its ability, just as it must for unliquidated claims in the bankruptcy-in-chief under 11 U.S.C. § 502(c).

Second, the logic of the situation demonstrates that the problem posed by the complexities of the situation is not as acute as defendants suggest. The Court need not determine the exact value of the post–1998 claims. All that must be determined is whether they exceeded the debtor's assets. If the debtor is found to be insolvent, a post-judgment fluctuation in the claiming rate can only make the debtor more insolvent. If the debtor is found to be solvent, plaintiffs will have failed to sustain their burden at time of trial. Defendants will be protected from future fluctuations by the *res judicata* effect of the Court's verdict.

Defendants characterize the view adopted by the Court as a strict liability test, inequitable and unsettling to commercial expectations. In fact, the equities run the other way. The assumed facts in this Opinion picture W.R. Grace sitting in unwitting comfort on the surface at ground zero. The company has debts, very substantial debts, including debts that the company knows it can only estimate, but it

reasonably believes it is solvent. The truth, however, is that a subterranean cavern of liability lies just beneath the company's feet. It is at this moment, so plaintiffs allege, that W.R. Grace chooses to transfer away its most profitable division for far less than the division was worth.

■■ This Court does not posit a regime in which any transaction is at the peril of the transferor's insolvency. The rule is that an entity with creditors gives away its assets for less than fair value at the peril that it may be insolvent. The fundamental inquiry in a constructive fraudulent conveyance action is whether the transfer diminished the transferor's estate. *In re Sunset Sales, Inc.*, 220 B.R. 1005, 1013 (10th Cir. BAP 1998). If the transferor is solvent, it may diminish its estate without interference from the law. If the transferor is not solvent, the diminishment unfairly harms the transferor's creditors. This is true regardless of the transferor's intent and regardless of whether the transferor knew or should have known of its insolvency.

■ It is the purpose of the fraudulent conveyance statute to prevent this result. The settled commercial expectations that should be protected are those of the existing creditors, not those of less-than-full-value transferees. Creditors size up the financial responsibility of prospective debtors on the assumption that they will not simply give their assets away, or at least that there will be enough left over for the prospective debtor to satisfy prior liabilities. These considerations have only more force with respect to tort creditors whose choice of debtor is involuntary.

At the hearing, plaintiffs advanced a variant on their earlier argument. Conceding, apparently *arguendo*, that post-transfer information should only be considered to the extent it was reasonable for the debtor to know of that information on the transfer date, plaintiffs posit that the amount of post-transfer asbestos claims was not only unknown, but unknowable. This is, of course, consistent with the defendants' arguments regarding the complexity of estimating the future claiming rate of asbestos injuries.

Where later information is unknowable, plaintiffs argue that the burden of guessing wrong should be placed upon the debtor and its transferee. Defendants' response to this argument can be deduced from their established position. Defendants would contend that the more imponderable the complexities of future asbestos claims, the less likely it is that plaintiffs can sustain their burden of showing that the debtor's date-of-transfer estimate was unreasonable.

Accepting plaintiffs' argument would represent a holding in the alternative by this Court, but the thrust of this argument is consistent with what the Court has said already. Assuming for the moment that it matters that the future claiming rate is unknowable, it is still the case that these unknown post-transfer claims are existing "rights to payment" on the transfer date. The asbestos mass tort problem is characterized by long latency periods and tens of thousands of claims being raised, year in and year out. This distinguishes the case at bar from the typical reported case concerned with financial contingencies and unknowns.

Therefore, the Court agrees with plaintiffs' contention raised at oral argument. It is consistent with the fundamental purpose of the fraudulent conveyance statute already discussed. There is no unfairness to a debtor or to a less-than-fair-value transferee in placing the burden of a wrong solvency estimate upon them where there exists a historically unknowable

mass tort liability that may impair the debtor's ability to meet its obligations.

Defendants take an ill-considered detour into the issue of whether transferee paid equivalent value to argue that their expectations in exploiting a legal tax avoidance device in the transaction should be protected.[5] Here, where the creditors are alleged to be personal injury victims, this argument rings particularly hollow. Such creditors have their debtor forced upon them; plainly the commercial expectations involved in corporate tax-avoidance must take second place. Conversely, the purposes of the fraudulent conveyance statute to prevent debtors placing assets beyond the reach of their creditors is only more acute where the creditors are personal injury claimants.

Here the subterranean cavern opened and W.R. Grace was swallowed up. Plaintiffs argue and their point is a good one that they should not be the party burdened with W.R. Grace's failure to accurately calculate its actual, then-existing, asbestos liability. Fairness places this burden on the debtor and its transferee (who could, presumably, return the asset or make up the difference to provide fair value). The law is the same—contingent liabilities are to be reduced by the reasonably probability of the contingency, but mere errors in the debtor's calculation of its solvency are to be corrected to reflect the evidence.

Lastly, the Court takes note of footnote 8 of the *Frenville* opinion, where the Court of Appeals speculated that a mass-tort bankruptcy, and specifically an asbestos bankruptcy, might depart from its rule that only accrued state law torts give rise to a "right to payment" under the bankruptcy statute. 744 F.2d at 337 n. 8. As already note, *Frenville* dealt with core bankruptcy issues and not a state-law fraudulent conveyance claim, and this Court has ruled *supra* that state law should not be displaced in favor of "some overriding federal policy," *id.*, in this situation.

However, this Court agrees with the Court of Appeals underlying premise that mass torts, and particularly mature mass torts like personal injury from asbestos exposure, raise considerations with respect to timing that require careful consideration from the courts. The reality is that asbestos, similar to tobacco, has been a societal scourge for more than a generation. W.R. Grace knew it had a serous and open-ended asbestos liability problem for years before the transaction at issue here. Moreover, the asset transferred away is alleged to have been a substantial part of the company's portfolio.

That W.R. Grace's asbestos may already have injured so many people as to make the company insolvent on the transaction date is hardly an intuitively surprising proposition. Nor, in light of this historical context, can the growing realization of W.R. Grace's true liability be deemed a distinct occurrence subject to discount as an extrinsic, intervening contingency. Finally, it is not too much to expect that firms with well-established legacies of mass-tort liability should realize that transfers for less than equivalent value may harm their tort claimant-creditors should prognostications of future claims be inaccurate. These firms are in a special position with respect to such creditors.

5. Defendants state that they structured the transaction through the use of a Morris Trust to lawfully avoid tax obligations, and that the transaction was handled for them by sophisticated counsel. The implications of this argument may be that defendants doubt the Court's ability to analyze this transaction to determine whether equivalent value was paid. If so, then the Court is confident that their misgivings are misplaced.

Transactions, including legitimate tax-avoidance transactions, must take the reality of the companies' existing liability and the inherent difficulty in defining that liability's scope into consideration.

## CONCLUSION

■ The Tenth Circuit summed the governing principle up, holding that the courts

> may consider information originating subsequent to the transfer date if it tends to shed light on a fair and accurate assessment of the asset or liability as of the pertinent date. Thus, it is not improper hindsight for a court to attribute current circumstances which may be more correctly defined as current awareness or current discovery of the existence of a previous set of circumstances.

*In re Mama D'Angelo, Inc.*, 55 F.3d 552, 556 (10th Cir.1995). Subject to the caveats identified above regarding state law and compensable injury, post–1998 claims should be included in the solvency analysis of W.R. Grace for this constructive fraudulent conveyance proceeding.

An appropriate Order is attached.

### *ORDER*

For the reasons set forth in the Opinion of the Court filed herewith

It is on this 29th day of July, 2002

ORDERED that the Uniform Fraudulent Transfer Act as enacted by the State of New Jersey, N.J.S.A. 25:2–20 *et seq.* shall govern this fraudulent conveyance proceeding, and it is further

ORDERED that subject to the conditions and provisos identified in the Opinion of the Court, asbestos claims filed after the transfer date may be considered in determining the debtor's solvency in this case under section 5 of the UFTA as of the transfer date.